J-M07001-19

2019 PA Super 354

| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| WILLIAM HENRY COSBY, JR. | |
| Appellant | No. 3314 EDA 2018 |

Appeal from the Judgment of Sentence Entered September 25, 2018
In the Court of Common Pleas of Montgomery County
Criminal Division at No(s): CP-46-CR-3932-2016

BEFORE:  BENDER, P.J.E., GANTMAN, P.J.E., and NICHOLS, J.

OPINION BY BENDER, P.J.E.:                    **FILED DECEMBER 10, 2019**

Appellant, William Henry Cosby, Jr., appeals from the judgment of sentence of 3-10 years' incarceration, imposed following his conviction for three counts of aggravated indecent assault, pursuant to 18 Pa.C.S. § 3125(a)(1), (4), and (5).  After careful review, we affirm.

The trial court summarized the facts adduced at trial as follows:

In January 2004[,][1][] [Appellant] sexually assaulted [the] then thirty[-]year[-]old [Victim] at his home in Elkins Park, Cheltenham, Montgomery County.  On the evening of the assault, [Victim] was invited to the then sixty-six[-]year[-]old [Appellant]'s home to discuss her upcoming career change.  She had decided to leave her position as the Director of Basketball Operations for the Temple women's basketball team, and to return to her native Canada to pursue a career in massage therapy.  When she arrived at the home, she entered through the kitchen door, as she had on prior visits.  She and [Appellant] sat at the kitchen table and began talking.  There was a glass of water and a glass of wine on the table when she arrived.  Initially, she drank only the water because she had not eaten a lot and did not want

to drink on an empty stomach. Eventually, [Appellant] convinced her to taste the wine. They discussed the stress she was feeling at the prospect of telling [the basketball coach] that she was leaving Temple. [Victim] left the table to use the restroom. When she returned, [Appellant] was standing by the table, having gone upstairs himself while she was in the bathroom. He reached out his hand and offered her three blue pills. He told her, "These are your friends. They'll help take the edge off." She asked him if she should put the pills under her tongue. He told her to put them down with water, and she did.

[1] In each of her statements to police, and in prior testimony, [Victim] indicated that the assault took place in 2004. She indicated to police that the assault happened prior to her cousin['s] visiting from Canada; border crossing records indicate that he entered the United States on January 22, 2004. There was no evidence to indicate that the assault happened prior to December 30, 2003.

After she took the pills, [Victim] and [Appellant] sat back down at the kitchen table and continued their conversation. She began to have double vision and told [Appellant] that she could see two of him. Her mouth became cottony and she began to slur her words. [Appellant] told her that he thought she needed to relax. [Victim] did not know what was happening to her, but felt that something was wrong. They stood up from the table and [Appellant] took her arm to help steady her. Her legs felt rubbery as he walked her through the dining room to a sofa in another room. He placed her on the sofa on her left side and told her to relax there. She began to panic and did not know what was happening to her body. She felt weak and was unable to speak. She was unable to maintain consciousness. She was jolted awake by [Appellant] forcefully penetrating her vagina with his fingers. [Appellant] had positioned himself behind her on the couch, penetrated her vagina with his fingers, and fondled her breasts. He took her hand[,] placed it on his penis[,] and masturbated himself with her hand. [Victim] was unable to tell him to stop or to physically stop the assault.

She awoke sometime between four and five a.m. to find her pants unzipped and her bra up around her neck. She fixed her clothing and began to head towards the front door. As she walked towards the door, she saw [Appellant] standing in the doorway between the kitchen and the dining room. He was wearing a robe and slippers and told her there was a muffin and tea for her on

the table. She sipped the tea[,] took a piece of the muffin with her[,] and drove herself home.

At the time of assault, [Victim] had known [Appellant] since the fall of 2002 when she met him in her capacity as the Director of Basketball Operations. She was introduced to [Appellant] by Joan Ballast at a basketball game at the Liacouras Center. [Victim] accompanied Ms. Ballast and several others [who were] giving [Appellant] a tour of the newly renovated facilities. Several days after the initial introduction, [Appellant] called Temple with some questions about the renovations and spoke to [Victim] on the phone. Several weeks later, she again spoke to him on the phone at her office. They discussed having met at the game at Temple. They began having more regular conversations, mostly pertaining to Temple sports. The conversations also included personal information about [Victim]'s history as a professional basketball player, her educational background and her career goals.

After several phone conversations, [Appellant] invited [Victim] to his home for dinner. When she arrived at the home, [Appellant] greeted her and took her to the room where she ate her dinner. The chef served her meal and a glass of wine and she ate alone. As she was finishing her meal, [Appellant] came into the room and sat next to her on the couch. At this point, he placed his hand on her thigh. She was aware that this was the first time [Appellant] touched her, but thought nothing of it and left shortly after as she had been preparing to do.

Subsequently, [Appellant] invited her to attend a blues concert in New York City with other young women who shared similar interests, particularly related to health and homeopathic remedies. She did not see [Appellant] in person on that trip.

Sometime later, she was again invited to dine at [Appellant]'s home alone. The chef called her about the meal and again she ate in the same room as she had on the first occasion. For a second time, when she was finished [with] her meal, [Appellant] sat beside her on the couch. The conversation again revolved around things [Victim] could do to … break into sports broadcasting. On this occasion, [Appellant] reached over and attempted to unbutton and to unzip her pants. She leaned forward to prevent him from undoing her pants. He stopped. She believed that she had made it clear she was not interested in any

- 3 -

of that. She did not feel threatened by him and did not expect him to make a romantic or sexual advance towards her again.

[Victim] continued to have contact with [Appellant], primarily by phone and related to Temple sports. [Appellant] also had contact with [Victim]'s family. [Victim]'s mother … and … sister … attended one of [Appellant]'s performances in Ontario, and afterward, met him backstage.

In late 2003, [Appellant] invited [Victim] to meet him at the Foxwoods Casino in Connecticut. He put her in touch with Tom Cantone, who worked at the casino. When she arrived at the casino, she had dinner with [Appellant] and Mr. Cantone. After dinner, Mr. Cantone escorted [Victim] to her room. She thanked him and told him that she would have to leave early in the morning and would not have time to tour the Indian reservation that was on the property. [Appellant] called her and asked her to come back upstairs to his room for some baked goods. When she arrived at the room, he invited her in and continued to unpack his luggage cart. She believed that the baked goods were on the cart. During this time, they discussed their usual topics of conversation, Temple and sports broadcasting. [Victim] was seated on the edge of the bed. [Appellant] laid down on the bed. He fell asleep. [Victim] remained in the room for several minutes, and then she went back to her own room.

[Victim] testified that during this time, she came to view [Appellant] as a mentor and a friend.[2] He was well respected at Temple as a trustee and alumni, and [Victim] was grateful for the help that he tried to give her in her career. She continued her friendship with him, despite what she felt were two sexual advances; she was a young, fit woman who did not feel physically threatened by [Appellant].

[2] In his statement to police, [Appellant] agreed and indicated that [Victim] saw him as a mentor and that he encouraged that relationship as a mentor.

Following the assault, between January[] 2004 and March[] 2004, [Victim] and [Appellant] continued to have telephone contact, solely regarding Temple sports. In March 2004[, Appellant] invited [Victim] to a dinner at a restaurant in Philadelphia. [Victim] attended the dinner, hoping to speak to [Appellant] about the assault. After the dinner, [Appellant] invited her to his home to talk. Once at the home, she attempted to confront him to find out what he gave her and why he assaulted

her. She testified that he was evasive and told her that he thought she had an orgasm. Unable to get an answer, she lost her courage and left the home.

At the end of March 2004, [Victim] moved back to Canada. [Victim]'s mother … testified that when her daughter returned home, she seemed to be depressed and was not herself. She would hear her daughter screaming in her sleep, but [Victim] denied that anything was wrong.

After returning to Canada, [Victim] had some phone contact with [Appellant] related to his performance in the Toronto area. [Appellant] invited [Victim] and her family to attend that show. Her parents were excited to attend the show, and her mother had previously spoken with [Appellant] on the phone and attended two of his shows prior to the assault. [Victim's] mother brought [Appellant] a gift to the show.

In January 2005, [Victim] disclosed the assault to her mother. She woke up crying and called her mother. [Victim's mother] was on her way to work and called [Victim] back once she arrived at work. They decided to contact the Durham Regional Police in Ontario, Canada[,] when [Victim's mother] returned home from work. Unsure of how the American criminal justice system worked, and afraid that [Appellant] could retaliate against her or her family, [Victim] attempted to reach two attorneys in the Philadelphia area during the day.

Ultimately, that evening, [Victim] and her mother contacted the Durham Regional Police and filed a police report. Following the report, [Victim's mother] asked for [Appellant]'s phone number and called him. [Appellant] returned [Victim's mother]'s call the next day. During this call, both [Victim] and her mother spoke to [Appellant] on separate phone extensions. [Victim] confronted him about what happened and the three blue pills that he gave her. [Appellant] apologized, but would not tell her what he had given her. He indicated that he would have to check the prescription bottle and that he would write the name down and send it to them. [Victim] hung up the phone and her mother continued to speak to [Appellant]. He told [Victim's mother] that there was no penile penetration. [Victim] did not tell [Appellant] that she had filed a police report.

After this initial phone conversation with [Appellant], [Victim's mother] purchased a tape recorder and called him again. In the call, [Appellant] indicated that he wanted to talk about a "mutual

feeling or friendship," and "to see if [Victim] is still interested in sports [broad]casting or something in T.V." [Appellant] also discussed paying for [Victim] to continue her education. He continued to refuse to give [Victim's mother] the name of the medication he had given [Victim]. Additionally, he invited her and [Victim] to meet him in another city to meet with him to discuss these offers in person and told her that someone would call them to arrange the trip.

Subsequently, [Victim] received a phone message from Peter Weiderlight, one of [Appellant]'s representatives. Mr. Weiderlight indicated in his message that he was calling on behalf of [Appellant] to offer [Victim] a trip to see [Appellant]'s upcoming performance in Florida.

When [Victim] returned Mr. Weiderlight's call, she recorded the conversation. During this conversation, Mr. Weiderlight discussed [Appellant]'s offer for [Victim] and her mother to attend a performance … in Miami and sought to obtain her information so that he could book flights and make reservations. [Victim] did not give him that information or call him back to provide the same. [Victim] also received a message from [Appellant]'s attorney, Marty Singer, Esq., wherein he indicated that [Appellant] wished to set up an educational trust for [Victim]. [Victim] did not return Mr. Singer's call. Both of these calls were received within days of [Victim]'s report to police.

The Durham Regional Police referred the report to the Philadelphia Police, who ultimately referred it to the Cheltenham Police Department in Montgomery County, Pennsylvania. Sergeant Richard Schaeffer, of the Cheltenham Township Police Department, was assigned to the case in 2005. Cheltenham police investigated jointly with the Montgomery County Detective Bureau. On January 19, 2005, Sgt. Schaeffer spoke to [Victim] by phone to obtain a brief description of her allegations. He testified that [Victim] was nervous and anxious during this call. She then drove from Canada to meet with law enforcement in person in Montgomery County. She testified that in each of her meetings with law enforcement she was very nervous. She had never had any previous contact with law enforcement, and discussing the nature of the assault made her uncomfortable. She testified that she cooperated with the police and signed releases for her mental health, banking and phone records.

On January 24, 2005, then Montgomery County District Attorney Bruce L. Castor, Jr., issued a signed press release indicating that an investigation had commenced following [Victim]'s January 13, 2005[] report to authorities in Canada. As part of the investigation, law enforcement, including Sgt. Schaeffer, took a written[] question and answer statement from [Appellant] in New York City on January 26, 2005. [Appellant] was accompanied by counsel, both his criminal defense attorney Walter M. Phillips[, Esq.,][3][] and his longtime general counsel John P. Schmitt, Esq., when he provided his statement to police.

[3] Mr. Phillips passed away in early 2015.

In his statement to police, [Appellant] stated that he met [Victim] in 2002 at the Liacouras Center. He stated [that] they had a social and romantic relationship that began on her second visit to his home. He stated that she was alone with him in the home on three occasions. As to the night of the assault, he stated that [Victim] had come to his home and they were talking in the kitchen about her inability to sleep. He told police that he gave her Benadryl that he uses to help him sleep when he travels. He stated that he would take two Benadryl and would become sleepy right away. He gave [Victim] one and [one-]half pills. He did not tell [Victim] what the pills were. He stated that he was comfortable giving her pills to relax her. He stated that she did not appear to be under the influence when she arrived at his home that night.

He stated that after he gave her the pills, they began to touch and kiss on the couch with clothes on. He stated that she never told him to stop and that he touched her bare breasts and genitalia. He stated that he did not remove his clothing and [Victim] did not touch him under his clothes. He told police, "I never intended to have sexual intercourse, like naked bodies with [Victim]. We were fully clothed. We are petting. I enjoyed it. And then I stopped and went up to bed. We stopped and then we talked."

He stated that there were at least three other occasions where they engaged in similar petting in his home. When asked if they had ever had intercourse, he stated, "[n]ever asleep or awake." He stated that on each occasion, he initiated the petting. He stated that on her second visit to his home, they were kissing in the hallway and he lifted her bra to kiss her breasts and she told him to stop.

- 7 -

He stated that, just prior to the date of his statement, he spoke to [Victim's mother] on the phone and she asked him what he had given her daughter.  He told her that he gave [Victim] some pills and that he would send her the name of them.  He further stated that [he] told [Victim's mother] there was no penile penetration, just petting and touching of private parts.  He also stated that he did not recall using the word 'consensual' when describing the encounter to [Victim's mother].  He also answered "no," when asked if he ever knew [Victim] to be untruthful.  Following that interview, [Appellant], unprompted, provided law enforcement with pills that were later identified as Benadryl.

On February 17, 2005, law enforcement had a strategy meeting where they created a plan for the next steps in the investigation.  Later that same day, then District Attorney, Bruce L. Castor, Jr., issued a second, signed press release, this time stating that he had decided not to prosecute [Appellant].  The press release cautioned that the decision could be reconsidered.  Mr. Castor never personally met with [Victim].

[Victim]'s attorneys, Dolores Troiani, Esq., and Bebe Kivitz, Esq., first learned of Mr. Castor's decision not to prosecute when a reporter arrived at Ms. Troiani's office on the evening of February 17, 2005[,] seeking comment about what Bruce Castor had done.  The reporter informed her that Mr. Castor had issued a press release in which he declined prosecution.  Ms. Troiani had not received any prior notification of the decision not to prosecute.

At a pretrial hearing held on February 2 and 3, 2016, Mr. Castor testified that it was his intention in 2005 to strip [Appellant] of his Fifth Amendment right to force him to sit for a deposition in a yet[-]to[-]be[-]filed civil case, and that Mr. Phillips, [Appellant]'s criminal attorney, agreed with his legal assessment.  Mr. Castor also testified that he relayed this intention to then First Assistant District Attorney Risa V. Ferman.[4]

[4] Ms. Ferman is now a Judge on the Court of Common Pleas.

Disappointed with the declination of the charges, [Victim] sought justice civilly.  On March 8, 2005, she filed a civil suit against [Appellant] in federal court.  As part of the lawsuit, both parties were deposed.  On four dates, September 28 and 29, 2005[,] and March 28 and 29, 2006, [Appellant] sat for depositions in the civil matter.  He was accompanied by counsel, including Mr. Schmitt.  Mr. Schmitt testified that Mr. Phillips had informed him of Mr. Castor's promise not to prosecute.

[Appellant] did not invoke the Fifth Amendment during the depositions; however, counsel did advise him not to answer questions pertaining to [Victim] and her attorneys filed motions to compel his testimony. [Appellant] did not invoke the Fifth Amendment when asked about other alleged victims. At no time during the civil litigation did any of the attorneys for [Appellant] indicate on the record that [Appellant] could not be prosecuted. There was no attempt by defense attorneys to confirm the purported promise before the depositions, even though Mr. Castor was still the District Attorney; it was never referenced in the stipulations at the outset of the civil depositions.

In his depositions, [Appellant] testified that he met [Victim] at the Liacouras Center and developed a romantic interest in her right away. He did not tell her of his interest. He testified that he was open to "sort of whatever happens" and that he did not want his wife to know about any relationship with [Victim]. When asked what he meant by a romantic interest, he testified "[r]omance in terms of steps that will lead to some kind of permission or no permission or how you go about getting to wherever you're going to wind up." After their first meeting, they spoke on the phone on more than one occasion. He testified that every time [Victim] came to his Elkins Park home it was at his invitation; she did not initiate any of the visits.

He testified that there were three instances of consensual sexual contact with [Victim], including the night he gave her the pills. [During] one of the encounters, he testified that he tried to suck her breasts and she told him "no, stop," but she permitted him to put his hand inside of her vagina. He also testified about the pills he gave law enforcement at the January 26, 2005 interview. Additionally, he testified that he believed the incident during which he gave [Victim] the pills was in the year 2004, "[b]ecause it's not more than a year away. That's a time period that I knew-it's a ballpark of when I knew [Victim]."

He testified that he and [Victim] had discussed herbal medicines and that he gave [Victim] pills on one occasion, that he identified to police as Benadryl[]. He testified about his knowledge of the types of Benadryl and their effects. He indicated that he would take two pills to help him go to sleep.

[Appellant] testified that on the night of the assault, [Victim] accepted his invitation to come to his home. They sat at a table in the kitchen and talked about [Victim]'s position at Temple as

well as her trouble concentrating, tension and relaxation. By his own admission, he gave [Victim] one and one[-]half Benadryl and told her to take it, indicating, "I have three friends to make you relax." He did not tell her the pills were Benadryl. He testified that he gave her the three half pills because he takes two and she was about his height. He testified that she looked at the pills, but did not ask him what they were.

[Appellant] testified that, after he gave her the pills, they continued to talk for 15-20 minutes before he suggested they move into the living room. He testified that [Victim] went to the bathroom and returned to the living room where he asked her to sit down on the sofa. He testified that they began to "neck and we began to touch and feel and kiss, and kiss back," and that he opened his shirt. He then described the encounter,

> [t]hen I lifted her bra up and our skin-so our skin could touch. We rubbed. We kissed. We stopped. I moved back to the sofa, coming back in a position. She's on top of me. I place my knee between her legs. She's up. We kiss. I hold her. She hugs. I move her to the position of down. She goes with me down. I'm behind her. I have [my left arm behind] her neck...[.] Her neck is there and her head. There's a pillow, which is a pillow that goes with the decoration of the sofa. It's not a bedroom pillow. I am behind her. We are in what would be called … a spooning position. My face is right on the back of her head, around her ear. I go inside her pants. She touches me. It's awkward. It's uncomfortable for her. She pulls her hand-I don't know if she got tired or what. She then took her hand and put it on top of my hand to push it in further. I move my fingers. I do not talk, she does not talk but she makes a sound, which I feel was an orgasm, and she was wet. She was wet when I went in.

He testified that after the encounter he told her to try to go to sleep and then he went upstairs. He set an alarm and returned downstairs about two hours later when it was still dark out. [Victim] was awake and they went to the kitchen where he gave her some tea and a blueberry muffin that she took a bite of and wrapped up before she left.

During his depositions, [Appellant] also discussed his phone calls with [Victim's mother]. He testified that he told [Victim] and her mother that he would write the name of the pills he gave

[Victim] on a piece of paper and send it to her. He testified that he did not tell them it was Benadryl because,

I'm on the phone. I'm listening to two people. And at first I'm thinking the mother is coming at me for being a dirty old man, which is also bad-which is bad also, but then, what did you give my daughter? And [if] I put these things in the mail and these people are in Canada, what are they going to do if they receive it? What are they going to say if I tell them about it? And also, to be perfectly frank, I'm thinking and praying no one is recording me.

He testified that after his first, unrecorded phone call with [Victim], he had "Peter" from William Morris contact [Victim] to see if she would be willing to meet him in Miami. He also testified that he apologized to [Victim's mother] "because I'm thinking this is a dirty old man with a young girl. I apologized. I said to the mother it was digital penetration." He later offered to pay for [Victim] to attend graduate school. [Appellant] contacted his attorney Marty Singer and asked him to contact [Victim] regarding an educational trust.

He also testified that he did not believe that [Victim] was after money. When asked if he believed it was in his best interest that the public believe [Victim] consented, he replied "yes." He believed there would be financial consequences if the public believed that he drugged [Victim] and gave her something other than Benadryl.

In his deposition testimony, [Appellant] also testified about his use of Quaaludes with women with whom he wanted to have sex.

On November 8, 2006, the civil case settled and [Victim] entered into a confidential settlement agreement with [Appellant], Marty Singer and American Media.[5] [Appellant] agreed to pay [Victim] $3.38 million[,] and American Media agreed to pay her $20,000. As part of the settlement agreement, [Victim] agreed that she would not initiate a criminal complaint arising from the instant assault.

[5] American Media was a party to the lawsuit as a result of [Appellant's] giving an interview about [Victim]'s allegations to the National Enquirer.

The 2005-2006 civil depositions remained under temporary seal until 2015 when the federal judge who presided over the civil

case unsealed the records in response to a media request. As a result, in July 2015, the Montgomery County District Attorney's Office, led by then District Attorney Ferman, reopened the investigation.

On September 22, 2015, at 10:30 am, Brian McMonagle, Esq. and Patrick O'Connor, Esq., met with then District Attorney Ferman and then First Assistant District Attorney Kevin Steele at the Montgomery County District Attorney's Office for a discussion regarding [Appellant], who was represented by Mr. McMonagle and Mr. O'Connor. On September 23, 2015, at 1:30 pm, Bruce L. Castor, Jr., Esq., now a County Commissioner, sent an unsolicited email to then District Attorney Ferman.[6]

[6] This email was marked and admitted as Defendant's Exhibit 5 at the February 2016 *Habeas Corpus* hearing held in this matter.

In this September 23, 2015 email, Mr. Castor indicated "[a]gain with the agreement of the defense lawyer and [Victim]'s [lawyers,] I intentionally and specifically bound the Commonwealth that there would be no state prosecution of [Appellant] in order to remove from him the ability to claim his Fifth Amendment protection against self-incrimination, thus forcing him to sit for a deposition under oath." The correspondence further stated,

I signed the press release for precisely this reason, at the request of [Victim]'s counsel, and with the acquiescence of [Appellant]'s counsel, with full and complete intent to bind the Commonwealth that anything [Appellant] said in the civil case would not be used against him, thereby forcing him to be deposed and perhaps testify in a civil trial without him having the ability to 'take the 5th....' [B]ut one thing is fact: the Commonwealth, defense and [Victim]'s lawyers were all in agreement that the attached decision [February 17, 2005 press release] from me stripped [Appellant] of his Fifth Amendment privilege, forcing him to be deposed.[]

However, in his testimony at the hearing on [Appellant]'s Petition for *Habeas Corpus*, Mr. Castor indicated that there was no agreement and no *quid pro quo*. On September 23, 2015, at 1:47 pm, Mr. Castor forwarded this email identified above as Defendant's *Habeas* Exhibit 5 to Mr. McMonagle.

On September 25, 2015, then District Attorney Ferman sent a letter to Mr. Castor by way of hand delivery.[7]  In her letter[,] Ms. Ferman stated, "[t]he first I heard of such a binding agreement was your email sent this past Wednesday."  On September 25, 2015, at 3:41 pm, Mr. Castor sent an email to District Attorney Ferman.[8] In this email, he wrote Ms. Ferman, "[n]aturally, if a prosecution could be made out without using what [Appellant] said, or anything derived from what [Appellant] said, I believed then and continue to believe that a prosecution is not precluded."

[7] This letter was marked and admitted as Defendant's Exhibit 6 at the February 2016 *Habeas Corpus* hearing held in this matter. At 3:02 pm that same day, Mr. Castor's secretary forwarded a scanned copy of the letter to him by way of email.

[8] This email was marked and admitted as Defendant's Exhibit 7 at the February 2016 *Habeas Corpus* hearing in this matter.

On September 25, 2015, at 3:59 pm, Mr. Castor forwarded the letter from Ms. Ferman, identified above as Defendant's *Habeas* Exhibit 6, to Mr. McMonagle.  On September 25, 2015, at 4:19 pm, Mr. Castor forwarded the email identified above as Defendant's *Habeas* Exhibit 7 to Mr. McMonagle along with the message "Latest."  In his final email to Ms. Ferman on the subject, Mr. Castor stated, "I never said we would not prosecute [Appellant]."

In 2015, prosecutors and [d]etectives from Montgomery County visited [Victim] in Canada and asked her if she would cooperate in the instant case.  As a part of the reopened investigation in 2015, the Commonwealth interviewed numerous women who claimed that [Appellant] had sexually assaulted them. The Commonwealth proffered nineteen women for this [c]ourt's consideration[;] ultimately, five such women were permitted to testify at trial.

Heidi Thomas testified that in 1984, she was a twenty-two[-]year[-]old aspiring actress working as a model, represented by JF [I]mages.  JF Images was owned by Jo Farrell.[9]  In April of 1984, her agent told her that a prominent figure in the entertainment world was interested in mentoring young talent. She learned that [Appellant] was going to call her to arrange for one-on-one acting sessions.  [Appellant] called Ms. Thomas at her home and spoke to both of her parents.  Ms. Thomas' agency paid

for her to travel to Reno, Nevada[,] to meet with [Appellant] and booked her a room at Harrah's. Her family took a photo of her with her father and boyfriend when she was leaving for the airport; she testified that she dressed professionally because she wanted [Appellant] to know she took this opportunity very seriously. Ms. Thomas purchased a postcard of Harrah's when she arrived in Reno to commemorate her trip and kept several other mementos. When she arrived in Reno, Ms. Thomas was met by a driver. She eventually realized that they were driving out of Reno. They pulled up to a house, the driver told her that this is where the coaching would take place and that she should go in.

[9] In his deposition testimony, [Appellant] testified that Jo Farrell would send her clients to see him perform in Denver, C[olorado].

She rang the doorbell and [Appellant] answered the door. The driver showed her to her room. [Appellant] instructed her to change into something more comfortable and to come back out with her prepared monologue. She returned to a kitchen area and performed her monologue for [Appellant]. Unimpressed with her monologue, [Appellant] suggested that she try a cold read. In the script he gave her, her character was supposed to be intoxicated. She performed the scene. Again, unimpressed, [Appellant] questioned whether she had ever been drunk. She told him that she did not really drink, but that she had seen her share of drunk people in college. He asked her what she would drink if she were to have a drink and she indicated perhaps a glass of white wine. He got up and returned with a glass of white wine. He told her it was a prop and to sip on it to see if she could get more into character. She took a sip and then remembers only "snap shots" of what happened next. She remember[ed] [Appellant's] asking her if she was relaxing into the part. She remember[ed] waking up in a bed, fully clothed with [Appellant] forcing his penis into her mouth. In her next memory, she awoke with her head at the foot of the bed, and hear[d] [Appellant] say[,] "your friend is going to come again." Her next memory [wa]s slamming the door and then apologizing to [Appellant].

She awoke, presumably the next morning, feeling unwell. She decided to get some fresh air. She went to the kitchen, where she saw someone other than the driver for the first time. The woman in the kitchen offered her breakfast, but she declined. She went outside with her camera that she always carried with her, and took pictures of the estate. She took a number of photos of both the

interior and exterior of the house where she was staying. She also remembers going to a show and being introduced to the Temptations and being in [Appellant]'s dressing room. She testified that it did not occur to her to report the assault to her agent, and that she felt she must have given [Appellant] some signal to think it was okay to do that to her.

Two months later, in June 1984, [Ms.] Thomas called [Appellant], as he told her she could, in an attempt to meet with him to find out what had happened; she was told by his representative that she would be able to see him. She made arrangements to see him in St. Louis, using her own money. When she arrived in St. Louis, she purchased a postcard. On this trip, she photographed her hotel room and the driver who picked her up. Ms. Thomas attended the show, but was not allowed backstage. After [Appellant]'s performance, she accompanied him and others to a dinner. There were a number of people at the dinner and Ms. Thomas was unable to confront [Appellant] about what happened in Reno. As the evening came to a close and it became clear she would not be able to speak to him, she asked the driver or valet to take her picture with [Appellant]. She had no further contact with [Appellant]. At some time later, she told both a psychologist and her husband what happened.

Chelan Lasha testified that in 1986[,] when she was a seventeen-year-old senior in high school[] in Las Vegas, Nevada, a connection of her father's ex-wife put her in touch with [Appellant]. At that time, Ms. Lasha lived with her grandparents[.] [Appellant] called her home and spoke to her and to her grandmother. [Appellant] told her that he was looking forward to meeting her and to helping her with her education and pursuit of a career in acting and modeling. The first time she met [Appellant] in person, he came to her grandparents' home for a meal. They remained in phone contact and she sent headshots to his agency in New York.

After she graduated from high school that same year, she worked at the Las Vegas Hilton. [Appellant] returned to Las Vegas and invited Ms. Lasha to meet him at the Las Vegas Hilton. When she arrived at the hotel, she called [Appellant] and a bellman took her to the Elvis [Presley] Suite. Ms. Lasha understood the purpose of their meeting was to help her break into modeling and that someone from the Ford Modeling Agency would be meeting her and taking her picture. Ms. Lasha testified that she had a cold on the day of the meeting. [Appellant]

directed her to wet her hair to see what it looked like, and someone took some photographs of her. The photographer left. A second person came into the suite, who [Appellant] said was a therapist related to stress and relaxation; this person also left the suit[e].

Ms. Lasha was congested and blowing her nose, [and Appellant] offered her a decongestant. He gave her a shot of amaretto and a little blue pill. She took the pill. He gave her a second shot of amaretto. He sat behind her and began to rub her shoulders. She began to feel woozy and he told her that she needed to lay down. [Appellant] took her to the back bedroom; prior to that time, they had been in the living area of the suite.

When she stood up[,] she could barely move and [Appellant] guided her to the back bedroom. He laid her on the bed, at which point she could no longer move. He laid down next to her and began pinching her breasts and rubbing his genitals on her leg. She felt something warm on her leg. Her next memory is [Appellant] clapping to wake her up. When she awoke, she had a Hilton robe and her shorts on, but her top had been removed. Her top was folded neatly on a table with money on top. [Appellant] told her to hurry up and get dressed and to use the money to buy something nice for herself and her grandmother. During her incapacitation, she was aware of what was happening but was powerless to stop it. When she left the hotel, she drove to her guidance counselor's house and told her what happened. She also told her sister.

The day after the assault, Ms. Lasha's mother and grandmother attended a performance at the Hilton where [Appellant] was a participant. [Appellant] called her and asked her why she did not attend, [and] she told him she was sick and hung up the phone. A couple days later, Ms. Lasha attended a performance at the Hilton with her grandmother, where she heckled [Appellant]. Afterwards, she told her grandmother what happened. She was ultimately fired from her position at the Hilton. She reported the assault to the police in 2014.

Janice Baker-Kinney testified that she lived in Reno, Nevada[,] and worked at Harrah's Casino from 1981-1983. In 1982, Ms. Baker-Kinney was a twenty-four[-]year[-]old bartender at Harrah's. During the course of her employment, she met several celebrities who performed in one of Harrah's two showrooms. Performers could stay either in the hotel, or in a home owned by

Mr. Harrah, just outside of town. Ms. Baker[-]Kinney attended a party at that home hosted by Wayne Newton.

On one particular evening, one of the cocktail waitresses invited her to go to a pizza party being hosted by [Appellant]. [Appellant] was staying at Mr. Harrah's home outside of town. Ms. Baker-Kinney agreed to attend the party and met her friend at the front door of the home. [Appellant] answered the door. Ms. Baker-Kinney was surprised to find that there was no one else in the home for a party. She began to think that her friend was romantically interested in [Appellant] and asked her to come along so she would not be alone. She decided to stay for a little while and have a slice of pizza and a beer.

[Appellant] offered Ms. Baker-Kinney a pill, which she believes he said were Quaaludes. She accepted the pill and then he gave her a second pill, which she also accepted. Having no reason not to trust [Appellant], she ingested the pills. After taking the pill, she sat down to play backgammon with [Appellant]. Shortly after starting the game, she became dizzy and her vision blurred. She told [Appellant] that the game was not fair anymore because she could not see the board and fell forward and passed out on[] the game.

Ms. Baker-Kinney next remembers hearing voices behind her and finding herself on a couch. She realized it was her friend leaving the house. She looked down at her clothing and realized that her shirt was unbuttoned and her pants were unzipped. [Appellant] sat down on the couch behind her and propped her up against his chest. She remembers him speaking, but could not recall … the words he said. His arm was around her, inside her shirt, fondling her. He then moved his hand toward her pants. She was unable to move.

Her next memory is of [Appellant] helping her into a bed and then being awoken the next day by the phone ringing. She heard [Appellant] speaking on the phone and realized that they were in bed together and both naked. When [Appellant] got off of the phone, Ms. Baker-Kinney apologized for passing out and tried to explain that dieting must have affected her ability to handle the pills. She had a sticky wetness between her legs that she knew indicated they had sex at some point, which she could not remember.

Afraid that someone she worked with would be coming to clean the home, Ms. Baker-Kinney rushed to get herself dressed and get

out of the home. [Appellant] walked her to the front door and told her that it was just between them and that she should not tell anyone. She made a joke that she would not alert the media and left, feeling mortified.

The day after the assault, she worked a shift at Harrah's. At the end of her shift, she was leaving with a friend and heard [Appellant] calling her name across the room. She gave a slight wave and asked her friend to get her out of there and they left. Within days of the assault, she told her roommate, one of her sisters, and a friend what had happened.

Mary Chokran testified that in 1982, Ms. Baker-Kinney called her and was very distraught. Ms. Baker[-]Kinney told Ms. Chokran that she had taken what she thought was a Quaalude and that [Appellant] had given it to her. Ms. Baker-Kinney told her that she thought it was a mood-enhancing party drug, not something that would render her unconscious as it did.

Janice Dickinson testified that in 1982, when she was a twenty-seven[-]year[-]old[] established model represented by Elite Modeling Agency, [Appellant] contacted the agency seeking to meet with her. She first met [Appellant] at his townhouse in New York City. She went to the home with her business manager. She was excited about the meeting; she had been told that [Appellant] mentored people and had taken an interest in her. During the meeting[,] they discussed her potential singing career as well as acting. [Appellant] gave her a book about acting. After the meeting[,] she and her manager left the home.

Sometime later, Ms. Dickinson was working on a calendar shoot in Bali, Indonesia[,] when [Appellant] contacted her. [Appellant] offered her a plane ticket and a wardrobe to come meet him in Lake Tahoe to further discuss her desire to become an actress. She accepted the invitation and left her boyfriend in Bali to go meet [Appellant] to discuss the next steps to further her career.

When she arrived at the airport in Reno, Nevada, she was met by Stu Gardner, [Appellant]'s musical director. He took Ms. Dickinson to the hotel where she checked in to her room and put on the clothes … provided for her by the hotel boutique. She arranged to meet [Mr.] Gardner on a sound stage to go over her vocal range. [Appellant] arrived in the room. She attended [Appellant]'s performance and had dinner afterwards with [Appellant] and [Mr.] Gardner.

During the dinner, Ms. Dickinson drank some red wine. She began to experience menstrual cramps, which she expressed to the table. [Appellant] said he had something for that and gave her a little, round blue pill. She ingested the pill. Shortly after taking the pill, she began to feel woozy and dizzy. When they finished in the restaurant, Mr. Gardner left and [Appellant] invited her to his room to finish their conversation.

Ms. Dickinson traveled with a camera and took photographs of [Appellant], including one of him making a phone call, inside of his hotel room. She testified that after taking the photos, she felt very lightheaded and like she could not get her words to come out. When [Appellant] finished his phone call, he got on top of her and his robe opened. Before she passed out, she felt vaginal pain as he penetrated her vagina. She awoke the next morning in her room with semen between her legs and she felt anal pain.

Later that day, she saw [Appellant] and they went to Bill Harrah's house. At the house, she confronted [Appellant] and asked him to explain what happened the previous evening. He did not answer her. She left Lake Tahoe the next day on a flight to Los Angeles with [Appellant] and Mr. Gardner. From Los Angeles, she returned to Bali to complete her photo shoot. Ms. Dickinson did not report the assault; she was having commercial success as a model and feared that it would impact her career.

In 2002, Ms. Dickinson sought to include the rape in her memoir, No Lifeguard on Duty, but the publishing house's legal team would not allow her to include it. Judith Regan testified that she was the publisher of Ms. Dickinson's 2002 memoir. She testified that Ms. Dickinson told her that [Appellant] had raped her and that she wanted to include that in her book. Ms. Regan told Ms. Dickinson that the legal department would not allow her to include the story without corroboration. Ms. Dickinson was angry and upset when she learned she could not include her account in the book.

In 2010, Ms. Dickinson disclosed what happened to her to Dr. Drew Pinsky in the course of her participation in the reality show Celebrity Rehab. That conversation was never broadcast. She testified that she also disclosed [it] to a hairdresser and makeup artist.

Maud Lise-Lotte Lublin testified that when she was in her early twenties and living in Las Vegas, she modeled as a way to make money to finance her education. She met [Appellant] in 1989,

when she was twenty-three years old. Her modeling agency told her that [Appellant] wanted to meet her. The first time she met with him in person, he was reviewing other headshots from her agency; he told her that he would send her photos to a New York agency to see if runway or commercial modeling was the best fit for her.

She had subsequent contact with [Appellant]. [Appellant] also developed a relationship with her family. On one occasion, she and her mother went to the [University of Nevada, Las Vegas] track with [Appellant] where he introduced her to people as his daughter. She and her sister spent time with [Appellant] on more than one occasion. He was aware that her goal was to obtain an education and thought that modeling or acting would help her earn enough money to reach her educational goals. She felt that [Appellant] was a father figure or mentor. Eventually, that relationship changed.

[Appellant] called her and invited her to the Hilton in Las Vegas. She arrived at the suite and he began talking to her about improvisation and acting, as she had not done any acting at this point. During the conversation, he went over to a bar and poured her a shot, told her to drink it and that it would relax her. She told him that she did not drink alcohol. He insisted that it would help her work on improvisation and help the lines flow. She trusted his advice and took the drink. He went back to the bar and prepared her a second drink, which she accepted.

Within a few minutes, she started to feel dizzy and woozy and her hearing became muffled. [Appellant] asked her to come sit with him. He was seated on the couch; Ms. Lise-Lotte Lublin was standing. He asked her to come sit between his knees. She sat down; he began stroking her hair. [Appellant] was speaking to her, but the sound was muffled. She felt very relaxed and also confused about what this had to do with learning improvisation. She testified that she remembers walking towards a hallway and being surprised at how many rooms were in the suite. She has no further memory of the night. When she woke up, she was at home. She thought she had a bad reaction to the alcohol and told her family about the meeting. In the days that followed, she told additional friends that she thought she had accidentally had too much to drink and gotten sick and embarrassed herself. She continued to have contact with [Appellant].

- 20 -

On one occasion[,] she traveled to see [Appellant] at Universal Studios in California. She invited a friend to go with her as she felt uncomfortable seeing him alone after what happened. On the drive to Universal Studios, she told her friend that she was uncomfortable because [Appellant] had her sit down and he stroked her hair and she could not remember what happened. She came forward in 2014.

Trial Court Opinion (TCO), 5/14/19, at 1-33 (citations to the record omitted).

It is unnecessary to recount fully the tortured procedural history of this case, but for the following summary of the pertinent procedural events. On December 30, 2015, the Commonwealth charged Appellant by criminal complaint with three counts of aggravated indecent assault, 18 Pa.C.S. § 3125(a)(1), (4), and (5), for the incident involving Victim that occurred in Appellant's home in January of 2004.[1] Appellant filed a Petition for Writ of *Habeas Corpus* ("*Habeas* Motion I") on January 11, 2016, arguing for, *inter alia*, the dismissal of the charges based on Former District Attorney Castor's alleged promise not to prosecute Appellant.[2] **See** Reproduced Record ("RR") at 389a.[3] The trial court heard testimony and argument at a hearing held on

_____

[1] The Commonwealth later filed a criminal information setting forth the same charges on July 13, 2016.

[2] Appellant has not raised the other issues preserved in *Habeas* Motion I in the instant appeal.

[3] Due to the massive size of the certified record in this case, we will primarily cite to the reproduced record for ease of disposition. We note that the Commonwealth has not issued any objections to the contents of the reproduced record.

- 21 -

February 2 and 3, 2016. *Id.* at 412a-1047a. On February 4, 2016, the trial court denied *Habeas* Motion I.[4] *Id.* at 1048a.

Following a preliminary hearing held on May 24, 2016, the magistrate held the aforementioned charges over for trial. Subsequently, Appellant and the Commonwealth filed numerous pretrial motions.[5] On August 12, 2016, Appellant filed a motion to suppress the contents of his civil deposition testimony. *Id.* at 6271a-6290a. On September 6, 2016, the Commonwealth filed a motion to introduce evidence of Appellant's prior bad acts ("First PBA Motion"). Both matters were addressed at hearings held on November 1 and 2, 2016. *Id.* at 1049a-1191a. Appellant's suppression motion was denied on December 5, 2016. *Id.* at 1197a. The trial court granted in part and denied in part the First PBA Motion on February 24, 2017. *Id.* at 1198a (granting the motion with respect to a single prior-bad-acts witness, but denying the motion with respect to twelve other proffered witnesses).

Appellant's first jury trial began on June 5, 2017, and concluded on June 17, 2017, when the jury deadlocked on all three counts, leading the trial court to issue an order declaring a mistrial based upon "manifest necessity." Order,

_____

[4] Appellant filed an interlocutory appeal from the denial of *Habeas* Motion I. After initially granting a temporary stay, this Court granted the Commonwealth's motion to quash that appeal on April 25, 2016. Our Supreme Court denied further review on June 20, 2016. Indeed, Appellant filed numerous, unsuccessful interlocutory appeals from the decisions of the trial court. The remainder have been omitted as none impact our decision today.

[5] We will discuss only the pretrial motions that have at least some relevance to the issues raised in the current appeal.

- 22 -

6/17/17, at 1 (single page). On July 6, 2017, the trial court ordered a new trial. Order, 7/6/17, at 1 (single page).

On January 18, 2018, the Commonwealth filed a second motion *in limine,* seeking to introduce Appellant's prior bad acts ("Second PBA Motion"). RR at 1200a-1206a; ***Id.*** at 1208a-1308a (memorandum in support thereof). On January 25, 2018, Appellant filed a motion seeking to incorporate all of his previous pretrial motions from his first trial. On March 15, 2018, the trial court granted the Commonwealth's Second PBA Motion in part, and denied it in part. ***Id.*** at 1672a-1673a (permitting five of the nineteen proffered prior-bad-acts witnesses to testify).

Appellant's second trial commenced on April 2, 2018. On April 6, 2018, Appellant filed a motion seeking to excuse Juror 11 for cause. ***Id.*** at 2541a-2548a. The trial court denied the motion. ***Id.*** at 2714a (N.T., 4/9/18, at 153). On April 26, 2018, the jury returned a verdict of guilty on all counts. ***Id.*** at 5813a (N.T., 4/26/18, at 10). Sentencing was deferred pending an assessment by the Sexual Offender Assessment Board.

On July 25, 2018, Appellant filed a post-trial motion challenging the constitutionality of the trial court's retroactively applying to him the current version of Pennsylvania's Sex Offender Registration and Notification Act ("SORNA II"), 42 Pa.C.S. § 9799.10 *et seq*. ***Id.*** at 6291a-6297a. Appellant also filed a post-trial motion seeking recusal of the trial court judge on September 11, 2018, alleging newly-discovered evidence that the judge harbored a bias toward one of Appellant's pretrial hearing witnesses, Mr.

Castor. *Id.* at 5874a-5886a. The trial court denied the recusal motion on September 19, 2018. *Id.* at 5887a-5894a.

The trial court conducted a combined Sexually Violent Predator (SVP) and sentencing hearing on September 24 and 25, 2018. The trial court deemed Appellant to be an SVP under a clear-and-convincing-evidence standard. *Id.* at 6213a. The trial court also denied Appellant's constitutional challenge to SORNA II, which was later memorialized in an order dated September 27, 2018. *Id.* at 6214a. The trial court then sentenced Appellant to 3-10 years' incarceration. *Id.* at 6198a (N.T., 9/25/18, at 120).

Appellant filed a timely post-sentence motion, which the trial court denied on October 23, 2018. He then filed a timely notice of appeal on November 19, 2018, and a timely, court-ordered Pa.R.A.P. 1925(b) statement on December 11, 2018. The trial court issued its Rule 1925(a) opinion on May 14, 2019.

Appellant now presents the following questions for our review:

A. Where the lower court permitted testimony from five women (and a de facto sixth via deposition), as well as purported admissions from [Appellant]'s civil deposition, concerning alleged uncharged misconduct by [Appellant] that was: (a) more than fifteen years old; (b) lacking any striking similarities or close factual nexus to the conduct for which he was on trial; and (c) unduly prejudicial[;] was the lower court's decision clearly erroneous and an abuse of discretion, thus requiring that a new trial be granted?

B. Did the lower court abuse its discretion in failing to disclose his acrimonious relationship with an imperative defense witness[,] which not only created the appearance of impropriety[,] but was evidenced by actual bias?

C. Did the lower court err in denying the writ of *habeas* [*corpus*] filed on January 11, 2016[,] and failing to dismiss the criminal complaint where the Commonwealth, in 2005 through District Attorney Castor, promised [Appellant] that he would not be charged for the allegations made by [Victim]?

D. Did the lower court err in denying the motion to suppress where [Appellant], relying on the Commonwealth's promise not to prosecute him for the allegations by [Victim], had no choice but to abandon his constitutional rights under the Fifth Amendment of the U[.]S[.] Constitution and testify at a civil deposition?

E. Where the excerpts of [Appellant]'s deposition concerning his possession and distribution of Quaaludes to women in the 1970s had no relevance to the issue at trial, was the lower court's decision to allow this evidence to be presented to the jury clearly erroneous and an abuse of discretion, thus requiring that a new trial be granted?

F. Where the lower court's final charge to the jury erroneously included an instruction on "consciousness of guilt," a charge which was misleading and had no application to [Appellant]'s case, was the charge legally deficient, thus requiring a new trial [to] be granted?

G. Where the lower court allowed a juror to be impaneled, despite evidence demonstrating that the juror had prejudged [Appellant]'s guilt, did the lower court abuse its discretion and deprive [Appellant] of his constitutional right to a fair and impartial jury, thus, requiring that a new trial be granted?

H. Did the lower court abuse its discretion in applying SORNA II to the 2004 offenses for which [Appellant] had been convicted, in violation of the *ex post facto* clauses of the state and federal constitutions?

Appellant's Brief at 11-13.

## A. Prior Bad Acts Evidence

Appellant's first claim concerns the trial court's admission of prior bad acts ("PBA") evidence. The court admitted the testimony of five witnesses

who essentially testified that Appellant had drugged and then sexually assaulted them in circumstances similar to that recounted by Victim. The PBA evidence was admitted under the 'common plan/scheme/design' and 'absence of mistake' exceptions to the general evidentiary ban on PBA evidence. **See** Pa.R.E. 404(b). Appellant asserts that this PBA evidence was not admissible because it did not satisfy any exception.

The at-issue PBA evidence was the subject of the Commonwealth's January 18, 2018 Second PBA Motion. RR at 1200a-1206a. Pursuant to that motion, the Commonwealth sought to admit the testimony of 19 prior victims of Appellant's alleged sexual misconduct. Following a hearing held on March 5 and 6, 2018, the trial court granted the Second PBA Motion in part, and denied it in part. **Id.** at 1672a-1673a (Order, 3/15/18, at 1-2). The Commonwealth was thereby permitted to present the PBA testimony of five witnesses: Heidi Thomas, Chelan Lasha, Janice Baker-Kinney, Janice Dickinson, and Maud Lise-Lotte Lublin. The trial court did not permit the Commonwealth to introduce the testimony of the remaining 14 PBA witnesses proffered by the Commonwealth.

"The admission of evidence is committed to the sound discretion of the trial court, and a trial court's ruling regarding the admission of evidence will not be disturbed on appeal unless that ruling reflects manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support to be clearly erroneous." **Commonwealth v. Minich**, 4 A.3d 1063, 1068 (Pa. Super. 2010) (citations and quotation marks omitted).

Pennsylvania Rule of Evidence 404(b)(1) prohibits "[e]vidence of a crime, wrong, or other act … to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Pa.R.E. 404(b)(1). This is because "[t]he Commonwealth must prove beyond a reasonable doubt that a defendant has committed the particular crime of which he is accused, and it may not strip him of the presumption of innocence by proving that he has committed other criminal acts." **Commonwealth v. Ross**, 57 A.3d 85, 98-99 (Pa. Super. 2012) (citations omitted). However, PBA "evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident[,]" if "the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2).

Here, the trial court admitted the testimony of Heidi Thomas, Chelan Lasha, Janice Baker-Kinney, Janice Dickinson, and Maud Lise-Lotte Lublin under two PBA exceptions: the common plan/scheme/design exception, and the absence-of-mistake exception. Both exceptions were invoked to serve similar evidentiary goals for the Commonwealth. The Commonwealth sought to demonstrate that Appellant engaged in a pattern of non-consensual sex acts with his victims that were "quite distinct from a typical sexual abuse pattern; so distinct, in fact, that they are all recognizable as the handiwork of the same perpetrator—[Appellant]." Commonwealth's Brief at 44.

A determination of admissibility under the common plan/scheme/design exception

must be made on a case by case basis in accordance with the unique facts and circumstances of each case. However, we recognize that in each case, the trial court is bound to follow the same controlling, albeit general, principles of law. When ruling upon the admissibility of evidence under the common plan exception, the trial court must first examine the details and surrounding circumstances of each criminal incident to assure that the evidence reveals criminal conduct which is distinctive and so nearly identical as to become the signature of the same perpetrator. Relevant to such a finding will be the habits or patterns of action or conduct undertaken by the perpetrator to commit crime, as well as the time, place, and types of victims typically chosen by the perpetrator. Given this initial determination, the court is bound to engage in a careful balancing test to assure that the common plan evidence is not too remote in time to be probative. If the evidence reveals that the details of each criminal incident are nearly identical, the fact that the incidents are separated by a lapse of time will not likely prevent the offer of the evidence unless the time lapse is excessive.

*Commonwealth v. Frank*, 577 A.2d 609, 614 (Pa. Super. 1990).

Thus, the common plan/scheme/design exception aids in identifying a perpetrator based on his or her commission of extraordinarily similar criminal acts on other occasions. The exception is demanding in it constraints, requiring nearly unique factual circumstances in the commission of a crime, so as to effectively eliminate the possibility that it could have been committed by anyone other than the accused. *See Commonwealth v. Miller*, 664 A.2d 1310, 1318 (Pa. 1995) (holding admissible, to prove a common scheme, plan, or design, evidence that the defendant lured other victims of similar race and weight into his car, took them to remote areas to force sex upon them, beat them in a similar manner, and killed or attempted to kill them), *abrogation on other grounds recognized by* *Commonwealth v. Hicks*, 156 A.3d 1114 (Pa. 2017); *Commonwealth v. Clayton*, 483 A.2d 1345, 1349–50 (Pa. 1984)

(holding admissible, to prove a common scheme, plan, or design, evidence of a subsequent crime for which the defendant had already been acquitted, because it was strikingly similar in geographic location, motive and method of execution); *but see Commonwealth v. Fortune*, 346 A.2d 783, 787 (Pa. 1975) (holding inadmissible in a trial for felony murder, under the common scheme, plan, or design exception, evidence of defendant's commission of six prior robberies where "too many details … [were] unexplained or incongruous to say that one crime naturally tend[ed] to show that the accused [was] the person who committed the other").

This Court has also permitted PBA evidence under the common plan/scheme/design exception "to counter [an] anticipated defense of consent." *Commonwealth v. Tyson*, 119 A.3d 353, 361 (Pa. Super. 2015). In *Tyson*, the defendant was accused of rape and related offenses based on the following course of conduct:

> On July 31, 2010, [the victim,] G.B.[,] left work because she felt ill after donating plasma. G.B. asked [Tyson], whom she knew casually, to bring her some food. [Tyson] arrived at G.B.'s apartment and stayed as she fell asleep. During the early morning hours of August 1, 2010, G.B. claims she awoke to find [Tyson] having vaginal intercourse with her. [Tyson] told G.B. she had taken her pants off for him. G.B. claims she told [Tyson] to stop, and he complied. After falling back asleep, G.B. woke again later that night and went into her kitchen, where she allegedly found [Tyson] naked. G.B. claims she told [Tyson] she did not want to have sex with him and returned to bed. Shortly thereafter, G.B. claims, she woke up[,] and [Tyson] was again having vaginal intercourse with her. G.B. told [Tyson] to stop and asked him what he was doing. [Tyson] told G.B. her eyes were open the whole time.

*Id.* at 356.

The Commonwealth filed a motion *in limine* seeking to introduce evidence of Tyson's then 12-year-old rape conviction in Delaware, which the trial court denied. On appeal, the Commonwealth argued that the PBA evidence regarding the prior rape was admissible under both the common plan/scheme/design and absence-of-mistake exceptions, because Tyson "engaged in a pattern of non-consensual sexual intercourse with acquaintances who were in an unconscious or diminished state." *Id.* at 357. This Court noted

> numerous similarities between the two incidents: (1) the victims were the same race and similar in age; (2) both victims were casually acquainted with [Tyson]; (3) [Tyson]'s initial interaction with each victim was legitimate, where [Tyson] was invited into the victim's home; (4) [Tyson] had vaginal intercourse with each victim in her bedroom; (5) both incidents involved vaginal intercourse with an alleged unconscious victim who woke up in the middle of the act; and (6) in each case, [Tyson] knew the victim was in a compromised state.

*Id.*

This Court reversed the trial court's determination that the PBA evidence was not admissible, reasoning that the "relevant details and surrounding circumstances of each incident further reveal criminal conduct that is sufficiently distinctive to establish [that Tyson] engaged in a common plan or scheme." *Id.* at 360. The *Tyson* Court further stated:

> The factual overlap between the two incidents goes beyond the commission of crimes or conduct 'of the same general class.' The evidence does not merely show [Tyson] sexually assaulted two different women or that [his] actions are generically common to

- 30 -

many sexual assault cases. To the contrary, the incidents reflect a clear pattern where [Tyson] was legitimately in each victim's home; [he] was cognizant of each victim's compromised state; and [he] had vaginal intercourse with each victim in her bedroom in the middle of the night while the victim was unconscious.

*Id.* The *Tyson* Court also opined that the lapse in time between the rapes did not undermine its probative value, both because Tyson was incarcerated for a majority of that time, and because the "similarities [between] the two incidents render[ed] the five-year time gap even less important." *Id.* at 361.

The absence-of-mistake exception typically applies in circumstances where the identity of the accused is not at issue, such as where the evidence serves to prove that the cause of an injury was not accidental. A quintessential example of the absence-of-mistake exception to the ban on PBA evidence occurred in *Commonwealth v. Boczkowski*, 846 A.2d 75 (Pa. 2004), where the defendant's wife, Maryann, was found unconscious in the couple's hot tub. She later died. Maryann had alcohol in her blood, and paramedics observed the defendant trying to revive her when they arrived on the scene, suggesting that her death may have been accidental. However, other injuries to the victim's body suggested that she had been the target of foul play.

The defendant's former wife, Elaine, had died under similar circumstances just 4 years earlier.

Elaine died in her bathtub, Maryann in a hot tub. Both women were in their thirties and in good health. [The defendant] reported to the North Carolina police that Elaine had been drinking alcoholic beverages before entering the bathtub; he told Ross Township police that Maryann had been drinking prior to entering the hot

tub. [The defendant] told police in both jurisdictions that he and his wife had a minor argument on the evening before the death. In each case, police noticed that [the defendant] had fresh scratch marks on his arms, hands and torso shortly after his wife's death. The autopsies of both women revealed that they had died from asphyxiation, not drowning.

*Id.* at 82. The Commonwealth presented evidence of Elaine's death in Boczkowski's trial pursuant to Rule 404(b)(2) in order to demonstrate that Maryann's death was not an accident. Our Supreme Court determined that such evidence was admissible even if the defendant does not "actually forward a formal defense of accident, or even present an argument along those lines," because "the Commonwealth may have a practical need to exclude the theory of accidental death." *Id.* at 89.

The absence-of-mistake exception has also been used to defeat an anticipated defense of consent in a case of sexual misconduct. The *Tyson* Court permitted the PBA evidence at issue in that case under the absence-of-mistake exception, reasoning that:

> [Tyson] disputes G.B.'s account that she was asleep when [he] initiated sexual intercourse with her—[Tyson] maintains he thought G.B. consented to the act. Given the relevant similarities between the two incidents, evidence of [Tyson]'s prior rape would tend to prove he did not "mistakenly believe" G.B. was awake or gave her consent. [Tyson] was invited into G.B.'s home for another reason, [he] knew G.B. was in a compromised state, and G.B. awoke to find [him] having vaginal intercourse with her. [Tyson]'s prior conviction would likewise show he had been invited into the home of an acquaintance, knew the victim was in a compromised state, and had non-consensual sex with the victim while the victim was unconscious. The prior conviction would tend to prove [Tyson] was previously in a very similar situation and suffered legal consequences from his decision to have what proved to be non[-]consensual vaginal intercourse with an unconscious victim. Thus, the evidence would tend to show

[Tyson] recognized or should have recognized that, as with T.B., G.B.'s physical condition rendered her unable to consent.

**Tyson**, 119 A.3d at 362–63.

Instantly, Appellant contends that the PBA evidence—the testimony of Heidi Thomas, Chelan Lasha, Janice Baker-Kinney, Janice Dickinson, and Maud Lise-Lotte Lublin—should not have been permitted under either exception. Appellant argues that their testimony involved "strikingly dissimilar acts" and were too distant in time to outweigh the potential for undue prejudice. Appellant's Brief at 42. Thus, he asserts that the trial court abused its discretion by admitting the PBA evidence. Notably, under both exceptions, the standard for admission is virtually the same. The PBA evidence must be "distinctive and so nearly identical as to become the signature of the same perpetrator," and its probative value must not be undermined by the lapse in time between incidents. **Frank**, 577 A.2d at 614; **see also Tyson**, 119 A.3d at 359-60. Appellant first contends that the acts in question were too dissimilar to be admitted under either exception, and second, that the lapse in time between the conduct at issue in this case and the PBA evidence undermined its probative value.

The trial court justified its admission of the PBA evidence as follows:

The testimony of the five 404(b) witnesses was admissible under both the common plan, scheme or design exception and the lack of accident or mistake exception, with admissibility further supported by the doctrine of chances. Therefore, this claim must fail.

First, [Appellant] asserts that testimony of the permitted witnesses was too dissimilar to [Victim]'s allegations. This claim is belied by the record. Victim's testimony can be summarized as

follows: 1) [Victim] was substantially younger than the married [Appellant] and physically fit; 2) she met him through her employment at Temple University; 3) they developed what she believed to be a genuine friendship and mentorship. Over the course of that friendship, she accepted invitations to see [Appellant] socially, both with other people and alone; 4) after a period of time, during which he gained her trust, he invited her to his home to discuss her upcoming career change; 5) he offered her three blue pills and urged her to take them; 6) once she took the pills, she became incapacitated and was unable to verbally or physically stop the assault[; s]he did not consent to sexual contact with [Appellant]; [and] 7) during intermittent bouts of consciousness, she was aware of [Appellant's] digitally penetrating her vagina and using her hand to masturbate himself.

The allegations of the Commonwealth's 404(b) witnesses may be summarized as follows: 1) each woman was substantially younger than the married [Appellant] and physically fit; 2) [Appellant] initiated the contact with each woman, primarily through her employment; 3) over the course of their time together, she came to trust him and often developed what the woman believed to be a genuine friendship or mentorship; 4) each woman accepted an invitation from [Appellant] to a place in his control, where she was ultimately alone with him; 5) each woman accepted the offer of a drink or a pill, often after insistence on the part of [Appellant]; 6) after ingesting the pill or drink, each woman was rendered incapacitated and unable to consent to sexual contact; [and] 7) [Appellant] sexually assaulted her while she was under the influence of the intoxicant he administered. These chilling similarities rendered the 404(b) testimony admissible under the common plan, scheme or design and the absence[-]of[-]mistake exceptions.

TCO at 102-04 (footnotes omitted).

Appellant points to various dissimilarities between the PBA incidents and the instant matter. Appellant's Brief at 59-62. For instance, Appellant's relationship with Victim lasted longer than his relationship with any of the PBA witnesses. *Id.* at 59. Prior to the at-issue assault, Victim was a guest at Appellant's home for dinner on multiple occasions, and Appellant and Victim

had exchanged gifts. *Id.* at 59-60. Appellant had made prior attempts at sexual contact with Victim, unlike with the other victims. *Id.* at 60. Additionally, the nature of the sexual contact between Appellant and his victims varied in each incident. *Id.* at 60-61. Finally, Appellant's assault of Victim was the only reported assault to occur in Appellant's home, whereas the PBA evidence only involved incidents "in a hotel room or in some third person's house." *Id.* at 62.

We disagree that these differences render the PBA evidence inadmissible under the common plan/scheme/design or absence of mistake exceptions. It is impossible for two incidents of sexual assault involving different victims to be identical in all respects. Indeed, we instead subscribe to the statement offered by Amicus Curiae, the Office of the Attorney General of Pennsylvania, when it states:

> A distinct pattern does not require outlandish or bizarre criminal conduct, nor does it demand proof that the conduct was part of a greater master plan. Rather, what is essential is that the similarities "are not confined to insignificant details that would likely be common elements regardless of who had committed the crimes." *Commonwealth v. Hughes*, 555 A.2d 1264, 1283 (Pa. 1989). A criminal "plan" may be analogized to a script or playbook of criminal tactics that worked for the offender when committing past crimes.

Brief of Amicus Curiae, the Office of the Attorney General of Pennsylvania, at 18. We further observe that no two events will ever be identical, and it is simply unreasonable to hold the admission of PBA evidence to such a standard. The question for the trial court was whether the pattern of misconduct demonstrated by the PBA evidence was sufficiently distinctive to

warrant application of the Rule 404(b)(2) exceptions. It is the pattern itself, and not the mere presence of some inconsistencies between the various assaults, that determines admissibility under these exceptions.

Here, the PBA evidence established Appellant's unique sexual assault playbook. His assault of Victim followed a predictable pattern based on the PBA evidence:

> [E]ach woman was substantially younger than the married [Appellant]; each woman met [Appellant] through her employment or career; most of the women believed he truly wanted to mentor them; [Appellant] was legitimately in each victim's presence because each had accepted an invitation to get together with him socially; each incident occurred in a setting controlled by [Appellant], where he would be without interruption and undiscovered by a third party; [Appellant] had the opportunity to perpetrate each crime because he instilled trust in his victims due to his position of authority, his status in the entertainment industry, and his social and communication skills; he administered intoxicants to each victim; the intoxicant incapacitated each victim; [Appellant] was aware of each victim's compromised state because he was the one who put each victim into that compromised state; he had access to sedating drugs and knew their effects on his victims; he sexually assaulted each victim—or in the case of one of his victims, engaged in, at minimum, untoward sexual conduct—while she was not fully conscious and, thus, unable to resist his unwelcomed sexual contact; and, none of the victims consented to any sexual contact with [Appellant].

Commonwealth Brief's at 42-44 (footnotes omitted). Indeed, not only did the PBA evidence tend to establish a predictable pattern of criminal sexual behavior unique to Appellant, it simultaneously tended to undermine any claim that Appellant was unaware of or mistaken about Victim's failure to consent to

the sexual contact that formed the basis of the aggravated indecent assault charges. Thus, both exceptions applied to the circumstances of this case.

Appellant argues that the trial court's admission of the PBA evidence conflicts with this Court's recent ruling in **Commonwealth v. Bidwell**, 195 A.3d 610 (Pa. Super. 2018), *reargument denied* (Nov. 13, 2018), *appeal denied*, 208 A.3d 459 (Pa. 2019). In **Bidwell**, the victim was discovered "hanging from an electrical heating wire tied to a refrigeration unit that was located in a trailer" in the appellee's scrap yard. **Id.** at 612. However, the victim's "face was not swollen or discolored, as is commonly seen in victims of hanging or ligature strangulation." **Id.** Nevertheless, "the original investigators and the coroner concluded that the [v]ictim committed suicide by hanging." **Id.**

Other evidence emerged linking Bidwell to the death, including a witness who claimed that he had admitted to killing the victim and to having arranged it to look like a suicide. It was also revealed that Bidwell had been involved in an extra-marital affair with the victim. **Id.** Bidwell also "made several contradictory statements regarding the circumstances of the [v]ictim's death and his whereabouts at that time." **Id.** at 613. The Commonwealth charged Bidwell with criminal homicide.

The Commonwealth subsequently filed a motion *in limine*, seeking to introduce PBA evidence, including evidence of Bidwell's prior violent conduct toward other women. The trial court granted admission of some PBA evidence (such as evidence concerning Bidwell's infidelity), but denied, *inter alia*,

evidence of his prior violent behavior toward *other* women.[6] The Commonwealth sought to use such evidence to demonstrate that the victim's death was not a suicide, and to show Bidwell's motive. The trial court excluded the evidence because "it was 'improper propensity evidence of [Bidwell]'s prior, **dissimilar** assaults on other women.'" **Id.** at 618 (emphasis added). The Commonwealth filed an interlocutory appeal from that order.

On appeal, this Court affirmed, ruling that the trial court had not abused its discretion in excluding the proffered PBA evidence regarding Bidwell's prior violent conduct. The **Bidwell** Court reasoned that:

> The Commonwealth's evidence failed to show that each woman was assaulted in the same manner or had been involved in a sexual relationship with [Bidwell] or that [he] was under the influence of alcohol or drugs at the time of the encounters with the women. To the contrary, the women's testimony establishes, at most, the commission of crimes or conduct in the past "of the same general class," namely physical and/or sexual assaults. Their testimony does not evidence any particular distinctive pattern of behavior by [Bidwell] in that [Bidwell]'s allegedly abusive behavior appears to have been triggered in each incident by different causes. For instance, it is alleged that [Bidwell] assaulted his wives during the course of their marriages, but he spontaneously attacked Ms. Sickle whom he had just met while she interviewed for a job. Ms. Benek indicated [Bidwell] did not physically accost her.
>
> In addition, the trial court found that the [PBA] testimony was not admissible to prove a "common scheme, plan or design." Under Pennsylvania law, evidence of prior bad acts is admissible to prove "a common scheme, plan or design where the crimes are so related that proof of one tends to prove the others." **Commonwealth v. Elliott**, … 700 A.2d 1243, 1249 ([Pa.] 1997).

_____

[6] The trial court in **Bidwell** did not prohibit PBA evidence concerning Bidwell's prior violent conduct toward the deceased victim. **Id.** at 618.

In **Elliott**, the appellant had been accused of sexually assaulting and killing a young woman whom he had approached outside a nightclub at 4:30 a.m.  The Pennsylvania Supreme Court affirmed the trial court's decision to permit three other young women to testify that the appellant also had preyed upon and physically and/or sexually assaulted each of them as they left the same club in the early morning hours.  **Id.** at … 1250–51.  Our Supreme Court held that evidence of the similarities among the assaults was admissible to establish a common scheme, plan or design. **Id.**

As the trial court found herein, the proposed testimony of Denise Bidwell, Jennifer Bidwell, Alyssa Benek and Danielle Sickle does not establish a pattern of conduct on the part of [Bidwell] so distinctive that proof of one tends to prove the others.  Instead, the prior bad acts testimony demonstrates that [Bidwell] was a domestic abuser of women, some of whom he was involved in on-going romantic relationships in the past, but it does not show a unique "signature" *modus operandi* relevant to the [v]ictim's murder.

**Bidwell**, 195 A.3d at 626–27.

We find **Bidwell** easily distinguishable from the instant case.  First, the procedural posture here is not the same as this Court confronted in **Bidwell**.  In **Bidwell**, the Commonwealth appealed from the denial of a motion *in limine* concerning the admissibility of evidence.  The burden was on the Commonwealth in that case to demonstrate that the trial court abused its discretion in deeming the PBA evidence inadmissible.  Here, Appellant bears the burden on appeal of demonstrating that the trial court abused its discretion by deeming admissible the at-issue PBA evidence.  Given the deference we pay to trial courts under the abuse of discretion standard, it would not necessarily follow that the holding in **Bidwell** dictates the same result in the instant case.

Second, the evidence in this case is not comparable to the facts in

***Bidwell***, as the circumstances here present a far more compelling argument

for admission of the PBA evidence under Rule 404(b)(2).  Here, the PBA

evidence established a distinct, signature pattern: Appellant presented himself

as a mentor or potential mentor to much younger women in order to establish

trust, and then he abused that trust by drugging those women in order to

sexually assault them.  This constitutes far more distinctive behavior than the

PBA evidence of prior domestic abuse considered by the ***Bidwell*** Court.  The

PBA evidence does not, as Appellant claims, merely "match[] the alleged act

on trial only in its general nature."  Appellant's Brief at 65.  Accordingly, we

reject his contention that ***Bidwell*** supports his claim.

Appellant also alleges that his assault on Victim and the assaults detailed

in the PBA evidence are too remote in time to be probative.  He argues:

> Baker-Kinney and Dickinson claim that [Appellant]'s alleged
> inappropriate contact with them occurred in 1982, more than two
> decades before the alleged incident with [Victim].  Thomas claims
> that [Appellant] forced her to perform oral sex on him in 1984;
> Lasha claims that her contact with [Appellant] was in 1986; and
> Lublin claimed that she became intoxicated with [Appellant] in
> 1989….    As to "Jane Doe 1," [Appellant] gave her a Quaalude,
> which she took knowing that it was a Quaalude, in the 70s.

***Id.*** at 66-67 (citations omitted).  The allegation of sexual assault in this case

concerned conduct that occurred in 2004.  Thus, the PBA evidence spanned

between 15-22 years prior to the conduct in this case for the testifying

witnesses, and at least a few years prior to that for the incident involving Jane Doe 1, about whom Appellant testified in his civil deposition.[7]

As our Supreme Court has stated, "even if evidence of prior criminal activity is [otherwise] admissible under [Rule 404(b)(2)], said evidence will be rendered inadmissible if it is too remote." *Commonwealth v. Shively*, 424 A.2d 1257, 1259 (Pa. 1981). However, this Court has also held that "while remoteness in time is a factor to be considered in determining the probative value of other crimes evidence under the theory of common scheme, plan or design, the importance of the time period is inversely proportional to the similarity of the crimes in question." *Commonwealth v. Aikens*, 990 A.2d 1181, 1185 (Pa. Super. 2010) (citation omitted).

Here, the time period in question is substantial, especially in relation to existing case law. Nevertheless, several factors tend to demonstrate that the probative value of the PBA evidence remains strong, despite that substantial time gap. There are distinctive similarities between the PBA evidence and Appellant's sexual assault of Victim. Furthermore, there were multiple prior sexual assaults, not merely one, and all of those prior assaults evidenced the same, signature pattern of misconduct. Had there only been a single prior bad act, it would be easier to write off the similarities as coincidental,

---

[7] We will not separately address Appellant's contention that Jane Doe 1 was effectively a sixth PBA witness, as Appellant only challenged the admission of the testimony of the five PBA witnesses in his Rule 1925(b) statement. *See* Appellant's 1925(b) Statement, 12/11/18, at ¶ 6; *Commonwealth v. Lord*, 719 A.2d 306, 309 (Pa. 1998) (holding that any issues not raised in a 1925(b) statement are waived).

especially given the passage of time. However, because the pattern here was well-established in this case, both in terms of frequency and similarity, the at-issue time gap is relatively inconsequential. Moreover, because Appellant's identity in this case was not in dispute (as he claimed he only engaged in consensual sexual contact with Victim), there was no risk of misidentification by use of the PBA evidence despite the gap in time. Accordingly, we conclude that the remoteness of the PBA evidence was so substantial as to undermine its probative value.

Appellant also contends that the trial court failed to make "any assessment of the highly prejudicial nature" of the PBA evidence. Appellant's Brief at 83. The record belies this claim. The Commonwealth sought the admission of 19 witnesses, and the trial court "found that the testimony of all 19 witnesses was relevant and admissible" under Rule 404(b)(2). TCO at 110. Nevertheless, "the [c]ourt sought to mitigate any prejudicial effect of such evidence by limiting the number of witnesses" to five. *Id.* Moreover, the trial court

> gave a cautionary instruction no less than four times during trial, and again in its concluding instructions, limiting the prejudicial effect of the testimony. N.T.[, 4/11/18,] at 45-46, 50-51; N.T.[, 4/12/18,] at 69, 167. Jurors are presumed to follow the court's instructions. *Commonwealth v. La Cava*, 666 A.2d 221, 228 (Pa. 1995). Limiting instructions weigh in favor of upholding admission of other bad acts evidence. … *Boczkowski*, 846 A.2d [at] 89….

*Id.* at 110-11. By limiting the number of relevant and admissible witnesses, as well as by issuing multiple cautionary instructions, the trial court

necessarily recognized the potential for unfair prejudice presented by the PBA evidence. Thus, Appellant's argument to the contrary is baseless.

Finally, we deem it unnecessary to address Appellant's claim that the trial court abused its discretion by relying on the 'Doctrine of Chances'[8] in admitting the PBA evidence,[9] as we agree with the trial court that the PBA evidence was admissible under both the common plan/scheme/design and the absence-of-mistake exceptions to Rule 404(b)(1)'s prohibition on PBA evidence. For all the aforementioned reasons, we conclude that the trial court did not abuse its discretion by admitting the PBA evidence and, therefore, Appellant's first claim lacks merit.

## B. Trial Judge's Failure to Disclose Prior Relationship with Former District Attorney Castor

Next, Appellant asserts that he is entitled to a new trial because the trial judge in this case, the Honorable Steven T. O'Neill ("Judge O'Neill"), failed to disclose his prior and allegedly "acrimonious" relationship with former District Attorney Castor ("Mr. Castor"). Appellant's Brief at 92. As discussed in more detail *infra*, Mr. Castor purportedly promised not to prosecute Appellant while he was serving as Montgomery County's District Attorney during the initial

---

[8] In his concurring opinion in **Commonwealth v. Hicks**, 156 A.3d 1114 (Pa. 2017), Chief Justice Saylor endorsed the 'Doctrine of Chances' theory, which holds, generally, that PBA evidence may be admissible where a logical inference can be drawn "that does not depend on an impermissible inference of bad character, and which is most greatly suited to disproof of accident or mistake." **Id.** at 1132 (Saylor, J., concurring).

[9] **See** Appellant's Brief at 79-82; TCO at 99-100.

investigation into Victim's accusations against Appellant. Judge O'Neill received testimony from Mr. Castor regarding that issue at a pretrial hearing, and Mr. Castor was essentially a witness for the defense. Appellant contends that Judge O'Neill was biased against Mr. Castor due to interactions between the two that are alleged to have occurred in 1999. The Commonwealth contends that Appellant waived this claim by failing to raise it at the earliest possible opportunity.

It is undisputed that, in 1999, Judge O'Neill and Mr. Castor were both "seeking the [R]epublican nomination for District Attorney in Montgomery County." *Id.* at 94. Mr. Castor won the nomination, and ultimately was elected as District Attorney. However, Appellant alleges that Mr. Castor's use of smear tactics during that campaign (allegedly prompting a confrontation with Judge O'Neill at a campaign event) produced a long-held bias in Judge O'Neill toward Mr. Castor. Appellant asserts that this purported bias calls into question the propriety of Judge O'Neill's making credibility determinations regarding Mr. Castor's purported promise not to prosecute Appellant, which occurred at a hearing held on February 2, 2016. Appellant essentially claims that Judge O'Neill should have recused himself from hearing testimony from Mr. Castor as a result of this bias. Appellant argues:

> The fact that the lower court and [Mr.] Castor had a previous relationship and disagreement is not a valid reason, alone, for the lower court to have recused himself. However, the issue is not their prior relationship, or a mere confrontation. Rather, then-Candidate O'Neill engaged [Mr.] Castor, in a contentious and very public confrontation over two highly sensitive topics: love and politics. Despite knowing [Mr.] Castor would be a crucial witness

in deciding whether the high-profile, nationally publicized trial of Cosby would be allowed to go forward, the lower court made the decision not to disclose his history with [Mr.] Castor.

*Id.* at 96-97.

In his Rule 1925(a) opinion, Judge O'Neill flatly denies that he harbors any bias against Mr. Castor, and states that he had nothing to disclose to the defense, and no reason to recuse. TCO at 125 ("This [c]ourt cannot disclose that which does not exist. This [c]ourt simply has no bias against Mr. Castor, thus no disclosure was necessary."). In any event, the trial court agrees with the Commonwealth that Appellant waived this claim. *Id.* at 126 (finding that Appellant "failed to raise the alleged issue at th[e] earliest possible moment").

"The standards for recusal are well established. It is the burden of the party requesting recusal to produce evidence establishing bias, prejudice or unfairness which raises a substantial doubt as to the jurist's ability to preside impartially." *Commonwealth v. Abu-Jamal*, 720 A.2d 79, 89 (Pa. 1998) (citations omitted). Until evidence establishes a jurist's bias, "[t]his Court presumes judges of this Commonwealth are 'honorable, fair and competent,' and, when confronted with a recusal demand, have the ability to determine whether they can rule impartially and without prejudice." *Commonwealth v. Luketic*, 162 A.3d 1149, 1157 (Pa. Super. 2017) (quoting *Commonwealth v. Druce*, 848 A.2d 104, 108 (Pa. 2004)).

Before we address the merits of this claim, we must address the Commonwealth's contention that Appellant waived our consideration of this issue, as

the law is clear. In this Commonwealth, a party must seek recusal of a jurist at the earliest possible moment, *i.e.*, when the party knows of the facts that form the basis for a motion to recuse. If the party fails to present a motion to recuse at that time, then the party's recusal issue is time-barred and waived.

*Lomas v. Kravitz*, 170 A.3d 380, 390 (Pa. 2017).

The Commonwealth contends that Appellant waived his recusal issue by waiting 167 days to raise it after discovering the factual basis for the claim. We agree. Although Mr. Castor testified before Judge O'Neill on February 2, 2016, prior to Appellant's first trial, Appellant did not raise the instant claim until after his second trial, and just prior to sentencing, on September 11, 2018. Appellant initially asserted this after-discovered-evidence-recusal claim based on a Radar Online article published on March 28, 2018. *See* Motion for Disclosure, Recusal, and for Reconsideration of Recusal, 9/11/18, at 3 ¶¶ 7-8 (asserting that neither Appellant nor his attorneys had any knowledge of the 1999 incident until the article was published). In the article, Appellant's spokesperson, Andrew Wyatt, was quoted as having just learned of the purported 1999 confrontation between Mr. Castor and Judge O'Neill. RR at 1679a ("A spokesman for Cosby, Andrew Wyatt, told Radar: 'It's very interesting—it's my first time hearing about it.'").

Appellant provided virtually no argument in his September 11, 2018 motion, nor does he provide any argument in his brief, indicating why he waited 167 days to seek Judge O'Neill's recusal based on the factual

allegations contained in the Radar Online article.[10]  Appellant has not denied

that his spokesperson, Mr. Wyatt, made the quoted statement, nor has he

asserted that Mr. Wyatt withheld that information from him or his attorneys.

In any event, even if we were inclined to disregard the obvious—that Mr.

Wyatt would have no rational reason for withholding such information from

Appellant or Appellant's counsel—Appellant has not offered any explanation

as to why he was unable to discover the Radar Online article at an earlier time.

Accordingly, we agree with the trial court and the Commonwealth that

Appellant waived this claim, as he failed to raise it at the earliest possible

opportunity.[11]  ***See Reilly by Reilly v. S.E. Pennsylvania Transp. Auth.***,

_____

[10] Appellant attempts to claim that his *sentencing counsel* had no knowledge of the Radar Online article until after June 14, 2018, when *sentencing counsel* entered his appearance.  Appellant's Brief at 114.  This excuse borders on frivolity.   It is undisputed that Appellant was represented by counsel at every stage of the proceedings below.  Yet, he has thus far failed to argue why he or his prior attorneys were unable to ascertain the contents of the Radar Online article at an earlier time.

In any event, even if we were to countenance the notion that only sentencing counsel's oversight of Appellant's defense was relevant to our analysis, Appellant has still not justified the delay of 89 days from when sentencing counsel entered his appearance until the recusal motion was filed. Furthermore, nowhere in Appellant's numerous filings has he ever stated a specific date, or even a general range of dates, establishing when he or his attorneys actually learned of the contents of the Radar Online article.  This alone demonstrates that Appellant has failed to satisfy his burden of demonstrating why he did not raise the matter at the earliest possible time.

[11] We note that Appellant provided this Court with an affidavit from Mr. Castor in the reproduced record (hereinafter "Castor's Affidavit").  ***See*** RR at 6215a-6223a.  Castor's Affidavit is dated October 20, 2018.  ***Id.*** at 6223a.  Therein, Mr. Castor ostensibly provides additional details concerning his prior

489 A.2d 1291, 1300 (Pa. 1985) (holding that an 8-month delay in raising a recusal motion after the facts were known to the moving party resulted in waiver of the recusal claim); *see also Lomas*, 170 A.3d at 391 ("[I]t is obvious that October 15, 2007, was not 'the earliest possible moment' that [the a]ppellants could have raised their objections regarding recusal, as all of

relationship with Judge O'Neill not contained in the Radar Online article, such as his recollections concerning the 1999 campaign, as well as various opinions held by Mr. Castor regarding Judge O'Neill's purported bias against him over the ensuing years. However, it is undisputed that Castor's Affidavit was never presented in the trial court, and it does not appear in the certified record in this case.

> [A]s an appellate court, our review is limited by the contents of the certified record. Pa.R.A.P.1921; *Commonwealth v. Young*, … 317 A.2d 258, 264 ([Pa.] 1974) ("only the facts that appear in [the] record may be considered by a court"). *See also Ritter v. Ritter*, … 518 A.2d 319, 323 ([Pa. Super.] 1986) ("the appellate court can only look at the certified record on appeal when reviewing a case"). All documents in a criminal matter must be filed with the clerk of courts in order to become part of the certified record. 42 Pa.C.S. § 2756(a)(1). Additionally, [the a]ppellant has the duty to ensure that all documents essential to his case are included in the certified record. *Fiore v. Oakwood Plaza Shopping Ctr.*, … 585 A.2d 1012, 1019 ([Pa. Super.] 1991) ( "It is the obligation of the appellant to make sure that the record forwarded to an appellate court contains those documents necessary to allow a complete and judicious assessment of the issues raised on appeal[.]"). If a document is not in the certified record then this Court cannot take it into account.

*Commonwealth v. Walker*, 878 A.2d 887, 888 (Pa. Super. 2005).

Thus, we cannot consider the contents of Castor's Affidavit. Nonetheless, even if we could consider it, we would still deem Appellant's recusal claim waived due to his failure to raise it at the earliest opportunity, as the basic, underlying facts were contained in the Radar Online article published on March 28, 2018.

the facts underlying the recusal issue were known to [them] … on September 6, 2007.").

### C. Mr. Castor's Alleged Promise Not to Prosecute

Appellant next argues that the trial court abused its discretion when it denied his *habeas corpus* motion seeking to quash the criminal complaint and bar his trial based on Mr. Castor's purported promise in 2005 not to prosecute him for his sexual assault of Victim.  As noted in the trial court's summary of the facts, *supra*, the original investigation into Appellant's 2004 sexual assault of Victim began in January of 2005, and ended the following month when, on February 17, 2005, Mr. Castor personally issued a press release in his capacity as District Attorney, which read in pertinent part as follows:

> Montgomery County District Attorney Bruce L. Castor, Jr. has announced that a joint investigation by his office and the Cheltenham Township Police Department into allegations against actor and comic Bill Cosby is concluded.
>
> …
>
> The District Attorney has reviewed the statements of the parties involved, those of all witnesses who might have first[-]hand knowledge of the alleged incident….  Detectives searched Mr. Cosby's Cheltenham home for potential evidence.  Investigators further provided District Attorney Castor with phone records and other items that might have evidentiary value.  Lastly, the District Attorney reviewed statements from other persons claiming that Mr. Cosby behaved inappropriately with them on prior occasions. However, the detectives could find no instance in Mr. Cosby's past where anyone complained to law enforcement of conduct, which would constitute a criminal offense.
>
> After reviewing the above and consulting with County and Cheltenham detectives, the District Attorney finds insufficient[] credible[] and admissible evidence exists upon which any charge against Mr. Cosby could be sustained beyond a reasonable doubt.

In making this finding, the District Attorney has analyzed the facts in relation to the elements of any applicable offenses, including whether or not evidence is admissible. Evidence may be inadmissible if it is too remote in time to be considered legally relevant or if it was illegally obtained pursuant to Pennsylvania law. After this analysis, the District Attorney concludes that a conviction under the circumstances of this case would be unattainable. As such, District Attorney Castor declines to authorize the filing of criminal charges in connection with this matter.

Because a civil action with a much lower standard of proof is possible, the District Attorney renders no opinion concerning the credibility of any party involved so as not to contribute to the publicity, and taint prospective jurors. The District Attorney does not intend to expound publicly on the details of his decision for fear that his opinions and analysis might be given undue weight by jurors in any contemplated civil action. District Attorney Castor cautions all parties to this matter that he will reconsider this decision should the need arise.

RR at 382a-383a.

After he was charged by the current District Attorney of Montgomery County on December 30, 2015, Appellant filed a *habeas corpus* petition alleging that his prosecution was barred by a non-prosecution agreement. ***Id.*** at 389a-391a (Appellant's Petition for Writ of *Habeas Corpus*, 1/11/16). However, it is undisputed that no written, formalized non-prosecution agreement exists in this case. Additionally, no order granting Appellant immunity from prosecution was previously sought by Appellant or Mr. Castor. Appellant contends that the above-stated press release, coupled with testimonial evidence regarding Mr. Castor's intent to bar Appellant's prosecution (and communication of that intent to Appellant's now deceased, former attorney in 2005), constituted a *de facto* "agreement, contract,

arrangement, or promise" not to prosecute him.[12]  Appellant's Brief at 127.

Alternatively, Appellant argues that the principle of promissory estoppel

barred his trials, reasoning that Mr. "Castor's promise was tailored to force

[Appellant] to relinquish his Fifth Amendment right and sit for a civil

deposition[,]" even if the promise was formally defective in conveying

immunity from prosecution.[13]  *Id.* at 129.

> The trial court rejected both claims.  The court first determined that
>
> the only conclusion that was apparent to this [c]ourt was that no
> agreement or promise not to prosecute ever existed, only the
> exercise of prosecutorial discretion.  A press release, signed or
> not, was legally insufficient to form the basis of an enforceable
> promise not to prosecute.  The parties did not cite, nor has this
> [c]ourt found any support in Pennsylvania law for the proposition
> that a prosecutor may unilaterally confer transactional immunity
> through a declaration as the sovereign.  Thus, the District
> Attorney was required to utilize the immunity statute, which
> provides the only means for granting immunity in Pennsylvania.

TCO at 62.

In rejecting Appellant's claim that the principle of promissory estoppel

barred his prosecution, the trial court reasoned:

> Even assuming, arguendo, that there was a defective grant of
> immunity, as would support a theory of promissory estoppel, any
> reliance on a press release as a grant of immunity was
> unreasonable.  [Appellant] was represented by a competent team
> of attorneys who were versed in written negotiations.  Yet none of

---

[12] As noted by the trial court, Mr. Castor also "testified that he intended to confer transactional immunity upon [Appellant] and that his power to do so as the sovereign was derived from common law not from the statutes of Pennsylvania."  TCO at 57 (citing N.T., 2/2/16, at 232-36 (RR 643a-647a)).

[13] Elements of Appellant's civil deposition were used as evidence against him at trial as discussed, *infra*.

these attorneys obtained Mr. Castor's promise in writing or memorialized it in any way, further supporting the conclusion that there was no promise. Therefore, the Commonwealth was not estopped from proceeding with the prosecution following their reinvestigation. The [c]ourt did not abuse its discretion and this claim must fail.

*Id.* at 65-66.

We review the denial of a motion seeking to quash a criminal complaint

or information under a well-settled standard of review.

The decision to grant or deny a motion to quash is within the sound discretion of the trial judge and will be reversed on appeal only where there has been a clear abuse of discretion. ***See Commonwealth v. Hackney***, … 178 A. 417, 418 ([Pa. Super.] 1935)…. A court, moreover, "should not sustain a motion to quash … except in a clear case where it is convinced that harm has been done to the defendant by improper conduct that interfered with his substantial rights."

***Commonwealth v. Niemetz***, 422 A.2d 1369, 1373 (Pa. Super. 1980).

Additionally, to the extent that denying such a motion turns in some

part on issues of fact, this Court is highly deferential to the findings of the trial

court.

Questions of credibility and conflicts in the evidence presented are for the trial court to resolve, not our appellate courts.

As long as sufficient evidence exists in the record which is adequate to support the finding found by the trial court, as factfinder, we are precluded from overturning that finding[.]

***Commonwealth of Pennsylvania, Dept. of Transp., Bureau of Traffic Safety v. O'Connell***, 555 A.2d 873, 875 (Pa. 1989) (citations omitted); ***accord Commonwealth v. Doolin***, 24 A.3d 998, 1003 (Pa. Super. 2011) ("It is well settled that the decision to grant a pretrial motion to dismiss a criminal charge is vested in the sound discretion of the trial court and may be

overturned only upon a showing of abuse of discretion or error of law.") (internal brackets, quotation marks, and citation omitted).

We first address whether a non-prosecution agreement existed that precluded Appellant's prosecution for the instant offenses. As a matter of law and based on the uncontested facts, independent of any credibility determination by the trial court, we hold that Appellant was not immune from prosecution based on Mr. Castor's alleged promise not to prosecute.

Like the trial court, we cannot uncover any authority suggesting that a district attorney "may unilaterally confer transactional immunity through a declaration as the sovereign." TCO at 62. Appellant has yet to present any authority suggesting otherwise and, therefore, it is clear on the face of the record that the trial court did not abuse its discretion in determining that there was no enforceable non-prosecution agreement in this case; *i.e.*, there was no legal grant of immunity from criminal prosecution conferred to Appellant by Mr. Castor. Even assuming Mr. Castor promised not to prosecute Appellant, only a court order can convey such immunity. Such promises exist only as exercises of prosecutorial discretion, and may be revoked at any time.

The exclusive authority for conferring immunity from prosecution rests within the immunity statute itself, 42 Pa.C.S. § 5947. Section 5947 provides, in pertinent part, that

> a district attorney may request an immunity order ***from any judge of a designated court***, and that judge shall issue such an order, when in the judgment of the Attorney General or district attorney:

(1) the testimony or other information from a witness may be necessary to the public interest; and

(2) a witness has refused or is likely to refuse to testify or provide other information on the basis of his privilege against self-incrimination.

42 Pa.C.S. § 5947(b) (emphasis added).

Mr. Castor indicated that he never sought such an order, and no evidence of such an order exists in this case.[14] Instead, Mr. Castor testified that he "made the decision as the sovereign that [Appellant] would not be prosecuted no matter what." RR at 475a (N.T., 2/2/16, at 64). Mr. Castor did not suggest under what statute or relevant case law he relied in exercising such authority outside the parameters of Section 5947. Indeed, Appellant makes no attempt in his brief to legally support Mr. Castor's contention at all. Thus, we ascertain no abuse of discretion in the trial court's determination that Appellant was not immune from prosecution, because Mr. Castor failed to seek or obtain an immunity order pursuant to Section 5947. At most, Mr. Castor exercised his prosecutorial discretion in promising not to prosecute Appellant. We have not discovered any case law, nor does Appellant cite to any relevant authority, holding that when a prosecutor exercises his or her

_____

[14] Nor does it appear that such an order would have been granted by a trial court had it been sought. Even if Mr. Castor's speculation was reasonable that a civil suit against Appellant was inevitable, and that it was equally inevitable that Appellant would have likely attempted to refuse to testify based on his 5th Amendment right against self-incrimination, there is no reason to believe that his testimony was "necessary to the public interest." 42 Pa.C.S. § 5947(b)(1). It was, at best, potentially helpful to Victim's private interest in a civil suit. However, regardless of whether Mr. Castor could have procured such an order, he did not even attempt to obtain one.

discretion not to prosecute, such action conveys immunity from future prosecution for the same accusation or offense, even if such a decision takes the form of an agreement. Only a court order conveying such immunity is legally binding in this Commonwealth.

Alternatively, Appellant argues that the trial court abused its discretion when it denied his *habeas corpus* motion seeking to bar his trial based on a promissory estoppel theory. As Appellant contends:

> The Commonwealth through [Mr.] Castor made a promise not to prosecute. In reliance on that promise, [Appellant] testified in a civil deposition without asserting his Fifth Amendment rights. Justice can only be served by holding the Commonwealth to their promise and upholding the non-prosecution agreement.

Appellant's Brief at 130.

Initially, we note that Appellant fails to cite any precedent for the proposition that a prosecution can be barred based on a contract theory of promissory estoppel, or anything similar. Rather, he merely provides this Court with boilerplate law concerning the theory and its application in contract law. As such, Appellant has utterly failed to convince us of the applicability of such a theory in barring a criminal prosecution. Accordingly, he is not entitled to relief on this basis alone.

In any event, even if we were to countenance Appellant's novel theory, we agree with the trial court that he cannot establish the necessary elements of a promissory estoppel claim. "Promissory estoppel enables a person to enforce a contract-like promise that would be otherwise unenforceable under

contract law principles." **Peluso v. Kistner**, 970 A.2d 530, 532 (Pa. Cmwlth. 2009).

> To establish promissory estoppel, the plaintiff must prove that: (1) the promisor made a promise that would reasonably be expected to induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise. These factors are strictly enforced to guard against the "loose application" of promissory estoppel.

**Id.** (citation omitted).

With regard to the first element, we agree with the trial court that it was not reasonable for Appellant to rely on Mr. Castor's promise, even if the trial court had found credible the testimony provided by Mr. Castor and Appellant's civil attorney, John Patrick Schmitt, Esq.[15] As noted above, there is simply no authority for the proposition that immunity from criminal prosecution can be conveyed by a prosecutor absent a valid court order pursuant to the immunity statute, 42 Pa.C.S. § 5947. We cannot deem reasonable Appellant's reliance on such a promise when he was represented by counsel, especially when immunity can only be granted by a court order, and where no court order granting him immunity existed.

With regard to the second element, there is virtually no evidence in the record that Appellant actually declined to assert his Fifth Amendment rights at the civil deposition based on Mr. Castor's purported promise not to

---

[15] The trial court did not find Mr. Castor's testimony regarding the promise not to prosecute to be credible.

prosecute. Appellant did not testify to this fact at either hearing on the at-issue *habeas* petition. Appellant's only witnesses were Mr. Castor and Attorney Schmitt. Mr. Castor testified that he had made such a promise through the press release, in part, and through conversations he had with Appellant's prior criminal defense attorney, Walter Phillips, Esq. (now deceased).

Yet, Attorney Schmitt was the only witness who could ostensibly testify as to whether Appellant relied on the alleged promise not to prosecute by sitting for a deposition in the civil case. Attorney Schmitt testified regarding his conversations with Mr. Phillips, indicating that Mr. Phillips had assured him that Mr. Castor's promise not to prosecute was binding,[16] and therefore Appellant could be compelled to testify during any subsequent civil litigation. RR at 703a (N.T., 2/3/16, at 11). However, as the Commonwealth accurately notes,

> Schmitt was forced to admit on cross-examination that he permitted [Appellant] to be questioned by police and, during an interview in advance of that questioning, did not believe that [Appellant] could incriminate himself[. N.T., 2/3/16, at 22-24]. He also admitted to negotiating with the *National Enquirer* on the details of a published interview with [Appellant] regarding the criminal investigation while the criminal investigation was ongoing, and also trying to negotiate the settlement agreement to prohibit [Victim] from ever cooperating with police in the future[.

---

[16] As noted above, Mr. Phillips was clearly mistaken in that regard, as immunity from prosecution can only be obtained by a court order pursuant to 42 Pa.C.S. § 5947.

*Id.* at 31-33, 44-48].  It was not necessary for the trial court to specifically state that it rejected … Schmitt's testimony, as it is patently obvious that his testimony belies his claim that there was some "promise" from [Mr.] Castor not to prosecute[.  *Id.* at 25-27.]  Further, by crediting the testimony of Troiani and Kivitz the trial court necessarily discredited Schmitt just as it did [Mr.] Castor.[17]

While [Appellant] seemingly takes issue with the trial court's treatment of Schmitt's testimony in its findings of fact and conclusions of law, he completely ignores the trial court's thorough analysis of his testimony in its 1925([a]) opinion, which makes it abundantly clear that Schmitt's conduct in representing [Appellant] was totally and completely inconsistent with the existence of any promise or agreement not to prosecute from [Mr.] Castor.

Commonwealth's Brief at 136-37.

We agree with the Commonwealth and the trial court that the evidence was entirely inconsistent with Appellant's alleged reliance on Mr. Castor's promise in choosing not to assert his Fifth Amendment privilege in the civil suit.  It is axiomatic that:

The privilege against self-incrimination can only be asserted when the witness is being asked to testify to self-incriminating facts and only when a witness is asked a question demanding an incriminating answer.  The witness has the burden of demonstrating that he or she has a reasonable ground for asserting the privilege.

*McDonough v. Com., Dept. of Transp., Bureau of Driver Licensing*, 618 A.2d 1258, 1261 (Pa. Cmwlth. 1992) (citation omitted).

---

[17] Troiani, one of Victim's attorneys in her civil case against Appellant, testified that she never received any information from Appellant's civil attorneys indicating that he could never be prosecuted.  N.T., 2/3/16, at 177.  She also indicated several reasons why it would not have been to Appellant's advantage to assert his Fifth Amendment rights during a civil trial in any event.  *Id.* at 176.

Attorney Schmitt believed that Appellant could not incriminate himself based on the testimony he intended to provide. If this was the case, then there was no basis for Appellant to assert the Fifth Amendment privilege in the civil suit, which is consistent with Appellant's prior decision to sit for an interview with criminal investigators. Moreover, Attorney Schmitt's actions were entirely inconsistent with reliance on the purported promise, as he failed to mention the alleged promise to Victim's civil attorneys, and he attempted to negotiate a settlement with Victim to prevent her from cooperating with the police in the future. Thus, even if Appellant's promissory estoppel theory were cognizable (and we hold that it is not), he would not be entitled to relief.

## D. Motion to Suppress the Contents of Appellant's Civil Deposition

Appellant next argues that the trial court abused its discretion when it denied his motion to suppress the contents of his civil deposition.

> [O]ur standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. We are bound by the suppression court's factual findings so long as they are supported by the record; our standard of review on questions of law is *de novo*. Where, as here, the defendant is appealing the ruling of the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted. Our scope of review of suppression rulings includes only the suppression hearing record and excludes evidence elicited at trial.

***Commonwealth v. Yandamuri***, 159 A.3d 503, 516 (Pa. 2017) (citations omitted).

Appellant's suppression argument is contingent upon his claim that Mr. Castor unilaterally immunized Appellant from criminal prosecution, which we have already rejected. We have also rejected Appellant's promissory estoppel theory as a basis for barring his prosecution, and we agree with the trial court that suppression is not warranted for the following reasons:

1. Instantly, this [c]ourt concludes that there was neither an agreement nor a promise not to prosecute, only an exercise of prosecutorial discretion, memorialized by the February 17, 2005 press release.

2. In the absence of an enforceable agreement, [Appellant] relies on a theory of promissory estoppel and the principles of due process and fundamental fairness to support his motion to suppress.

3. Where there is no enforceable agreement between parties because the agreement lacked consideration, the agreement may still be enforceable on a theory of promissory estoppel to avoid injustice. **Crouse v. Cyclops Indus.**, 745 A.2d 606 (Pa. 2000).

4. The party who asserts promissory estoppel must show (1) the promisor made a promise that he should have reasonably expected would induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise. **Id.** (citing Restatement (Second) of Contracts § 90). Satisfaction of the third requirement may depend, *inter alia*, on the reasonableness of the promisee's reliance and the formality with which the promise was made. **Thatcher's Drug Store of W. Goshen, Inc. v. Consol. Supermarkets, Inc.**, 636 A.2d 156, 160 (Pa. 1994) (citing Restatement (Second) of Contracts § 90, comment b).

5. Because there was no promise, there can be no reliance on the part of [Appellant] and principles of fundamental fairness and due process have not been violated.

6. This [c]ourt finds that there is no Constitutional barrier to the use of [Appellant]'s civil deposition testimony.

TCO at 72 (quoting Findings of Fact and Conclusions of Law, 12/5/16, at 5 (RR at 1196a)).

Appellant cites several cases in support of his claim, discussed below. However, we conclude that none of these cases suggest, much less compel, a ruling that the trial court abused its discretion in denying suppression of Appellant's civil deposition testimony in this matter.

Appellant first cites **Commonwealth v. Eiland**, 301 A.2d 651 (Pa. 1973), for the proposition that: "If the Commonwealth makes a promise to a defendant, who acts in detriment to their protected rights as a result of that promise, the District Attorney, as an 'administrator of justice,' cannot then renege on the promise and seek to benefit from the deceit." Appellant's Brief at 131.

However, **Eiland** did not involve circumstances comparable to the matter at hand. There, the defendant had claimed that his incriminating statement, given while in custody, was unlawfully induced through physical coercion and a substantial delay between his arrest and his arraignment. The **Eiland** Court ultimately granted relief, based on the following facts:

> The record evinces [u]ncontradicted evidence that [the defendant], a 20-year-old with a tenth grade education, was isolated for several periods of time; that upon his initial interrogation he refused to admit involvement in the shooting; that eleven hours later when told by the police he would get more lenient treatment if he confessed, he signed an incriminating statement; and that he was not arraigned until some twenty-five hours after arrest.

*Eiland*, 301 A.2d at 654. The *Eiland* Court concluded that the defendant had been subject to "impermissible psychological coercion." *Id.* at 655. Accordingly, the Court ruled that his incriminating statement should have been suppressed.

Here, Appellant was not in custody when he was deposed. The at-issue statement was given in the presence of experienced counsel at a civil deposition, and his civil deposition testimony was not compelled based on a promise that he would be shown leniency if he confessed directly to criminal conduct. Thus, *Eiland* is completely inapposite.

Next Appellant argues that relief is due pursuant to *United States v. Hayes*, 946 F.2d 230 (3d Cir. 1991). In *Hayes*, the defendant alleged that the Commonwealth had breached the terms of his plea agreement, which stated, *in writing*, that the district attorney would not recommend a specific sentence at sentencing. The Commonwealth breached that agreement by recommending a sentence in its sentencing memorandum. On that basis, the *Hayes* Court granted relief and vacated the defendant's sentence, reasoning that, "the government must honor its bargain with the defendant." *Id.* at 233.

The instant case does not involve a promise made pursuant to a plea agreement. Moreover, the agreement in *Hayes* was memorialized in writing and accepted by the trial court, and the specific terms of that agreement were not in dispute. Here, the purported promise by Mr. Castor was not memorialized in writing, and Appellant's alleged consideration for that promise

was nonexistent at the time; indeed, the Commonwealth in this case claims that no agreement or promise existed at all. Furthermore, there is no evidence that the purported promise not to prosecute was the product of a negotiation, rather than merely being a unilateral declaration made by Mr. Castor. Thus, **Hayes** does not support Appellant's claim.

Appellant also cites **Commonwealth v. Stipetich**, 652 A.2d 1294 (Pa. 1995). In that case, Pittsburgh police searched George and Heidi Stipetich's home pursuant to a warrant and discovered a small quantity of drugs and related paraphernalia.

> Sergeant Thomas, the officer in charge of the search, was subsequently contacted by the Stipetiches' attorney, Charles Scarlata. Thomas and Scarlata reached an agreement that, if George Stipetich would answer questions concerning the source of the controlled substances and drug paraphernalia found in his residence, no charges would be filed against either of the Stipetiches. George Stipetich then fulfilled his part of the agreement by answering all questions posed by the police.
>
> Nevertheless, … on the basis of the contraband recovered in the foregoing search, Allegheny County authorities charged the Stipetiches with possession of controlled substances. Citing the non-prosecution agreement entered with the Pittsburgh police, the Stipetiches filed a motion seeking dismissal of the charges. The motion was granted by the [C]ourt of [C]ommon [P]leas.

*Id.* at 1294-95. Our Supreme Court reversed that decision because the "non-prosecution agreement was, in short, invalid. The Pittsburgh police did not have authority to bind the Allegheny County District Attorney's office as to whether charges would be filed." *Id.* at 1295.

However, the **Stipetich** Court opined that:

- 63 -

The decisions below, barring prosecution of the Stipetiches, embodied concern that allowing charges to be brought after George Stipetich had performed his part of the agreement by answering questions about sources of the contraband discovered in his residence would be fundamentally unfair because in answering the questions he may have disclosed information that could be used against him. The proper response to this concern is not to bar prosecution; rather, it is to suppress, at the appropriate juncture, any detrimental evidence procured through the inaccurate representation that he would not be prosecuted.

*Id.* at 1296.

This language from **Stipetich**, relied upon by Appellant, is merely *dicta*. The holding in **Stipetich** was solely that the Stipetiches' prosecution was not barred by the invalid non-prosecution agreement. Nevertheless, **Stipetich** is also factually distinguishable from the instant case. Here, there was no negotiated agreement, just a unilateral declaration by Mr. Castor, which on its face did not grant Appellant immunity from prosecution. Moreover, as Mr. Castor testified, "there wasn't any *quid pro quo* here." RR at 99 (N.T., 2/2/16, at 99). Indeed, at the time of Mr. Castor's statement, Victim had not yet filed a civil claim against Appellant. Additionally, as discussed above, there was no reasonable reliance on a defective grant of immunity when the suit was filed and Appellant was ultimately deposed. Accordingly, **Stipetich** does not support Appellant's suppression claim.

Appellant also relies on **Commonwealth v. Peters**, 373 A.2d 1055 (Pa. 1977), but provides practically no analysis of that case. We find that **Peters** is easily distinguishable from the instant matter. In **Peters**, an uncounseled defendant waived his rights under **Miranda v. Arizona**, 384 U.S. 436 (1966),

- 64 -

and gave an incriminating statement when promised by a detective with the District Attorney's Office that he would not be prosecuted. Our Supreme Court held that the Commonwealth had not "carried its burden" to demonstrate that the defendant had knowingly, intelligently, and voluntarily waived his *Miranda* rights, where "[n]o explanation of this promise was provided by the Commonwealth." *Peters*, 373 A.2d at 1062. Here, Appellant was represented by multiple attorneys throughout the initial criminal investigation and civil proceedings, and gave the at-issue statement during a civil deposition, not during a custodial interrogation.

Appellant offers another cursory analysis of *Commonwealth v. Bryan*, 818 A.2d 537 (Pa. Super. 2003), but that case also does not suggest that he is entitled to relief. In *Bryan*, the defendant *failed to comply* with an invalid and unenforceable non-prosecution agreement with police. The trial court dismissed the subsequently filed charges due to a delay in filing the charges. We reversed, ruling, in part, that there was no demonstrable prejudice to the defendant due to the delay. *Id.* at 541-42. We then, in *dicta*, suggested that, "[h]ad incriminating information been obtained against [the defendant] as a result of the unauthorized agreement, he would be entitled to have that evidence suppressed." *Id.* at 542. In any event, in that case, the police offered not to prosecute in exchange for the defendant's assistance in unrelated criminal matters. The offer was made while the uncounseled defendant was detained for blood testing during a DUI arrest. Again, in this case, Appellant was represented by counsel, and there was no negotiation.

The Commonwealth did not receive any benefit from Mr. Castor's promise, and Appellant provided testimony while counseled at a civil deposition, not while under duress from a custodial interrogation.

Finally, in assessing the trial court's denial of Appellant's motion to suppress, we are bound by the court's factual determinations. The trial court determined that Mr. Castor's testimony and, by implication, Attorney Schmitt's testimony (which was premised upon information he indirectly received from Mr. Castor) were not credible.  The court found that the weight of the evidence supported its finding that no agreement or grant of immunity was made, and that Appellant did not reasonably rely on any overtures by Mr. Castor to that effect when he sat for his civil deposition.  Thus, for all of the aforementioned reasons, we do not ascertain any abuse of discretion in the trial court's denial of Appellant's motion to suppress his civil deposition.

## E. Evidence from Appellant's Civil Deposition Concerning His Possession and Distribution of Quaaludes in the 1970's

Next, Appellant challenges the admission of the portion of his civil deposition testimony pertaining to his possession and distribution of Quaaludes in the 1970s.  Appellant asserts that such evidence was inadmissible under Pa.R.E. 404(b), and that it did not satisfy any exception thereto as set forth in Rule 404(b)(2).  Specifically, Appellant challenges the admission at trial of his civil deposition testimony pertaining to

> the circumstances under which [Appellant] was prescribed the Quaaludes[, RR at 4789a-4790a;] the number of scripts obtained[, *id.* at 4790;] and his decision to share the Quaaludes,

noting that, at that time (*i.e.*, the 1970s), "Quaaludes happen to be the drug that kids, young people, were using to party with and there were times when I wanted to have them just in case." [*id.* at 4793a].

Appellant's Brief at 138.

The trial court determined that this evidence was admissible to establish Appellant's intent and motive in giving "a depressant to [Victim]" for the purpose of impairing her ability to refuse to consent to sexual activity. TCO at 115; *see* Pa.R.E. 404(b)(2) (permitting the admission of PBA evidence that demonstrates "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident[,]" if "the probative value of the evidence outweighs its potential for unfair prejudice.").

Appellant contends:

The [r]ecord is barren of any evidence which reflects that [Appellant] had Quaaludes in his possession in 2004[,] and that the pills [Victim] was given were Quaaludes. In fact, the [r]ecord reflects otherwise. Moreover, the fact that [Appellant] may have shared Quaaludes with women in the 1970s is not probative of his motive or intent concerning providing Benadryl to [Victim] in 2004.

Quaaludes were legal in the 1970s and were a "party drug" widely used in the 1970s and early 1980s. [RR at 4969a-4970a]. The fact that [Appellant] possessed but unlawfully shared Quaaludes in the 1970s while partying with other individuals may be salacious, but it does not establish any material fact in this case, nor does it make a fact at issue (*i.e.*, whether [Appellant] had non[-]consensual sexual contact with [Victim][)] more or less probable…. Further, it does not raise any reasonable inference supporting a material fact. It had no probative value and was not relevant but was extraordinarily prejudicial.

The prosecution offered this evidence to raise the innuendo that [Appellant] supplied women with Quaaludes back in the 1970s and then had sex with them. No facts were presented, however, to

support the conclusion that the women: (a) were forced to take the Quaaludes; (b) did not know that they were taking Quaaludes; (c) actually had sex with [Appellant]; and (d) if they had sex with [Appellant], had nonconsensual sex with [him]. The fact is, a person can be impaired by voluntarily taking a controlled or noncontrolled substance, or by consuming alcohol, and still engage in consensual sexual contact. That such may have happened between [Appellant] and some women in the 1970s in no way establishes whether, on some night in 2004, [Appellant] had nonconsensual contact with [Victim]. This prejudicial evidence was offered for no reason other than to smear [Appellant], a reason which certainly does not support the admissibility of the evidence. A new trial is warranted.

Appellant's Brief at 142-44.

The Commonwealth responds, first, that Appellant's admissions regarding his distribution of Quaaludes "were relevant because they tended to establish that he had knowledge of substances—particularly, central nervous system depressants—that would induce unconsciousness and facilitate a sexual assault." Commonwealth's Brief at 151.

[Appellant] specifically testified in his deposition that he obtained numerous prescriptions for Quaaludes, without intending to use the pills himself, but to give to "young women [he] wanted to have sex with[.]" [N.T.], 4/18/18, at 35, 40-42, 47…. He admitted that he knew the drugs caused at least one woman—"Jane Doe Number 1"—to get "high," appear "unsteady," and "walk[] like [she] had too much to drink[.]" [*Id.*] at 35-37…. He knew the drug was a central nervous system "depressant" because he had taken a similar medication following surgery. For that that reason, he did not take the drugs himself because he "get[s] sleepy" and he "want[s] to stay awake[.]" [*Id.*] at 41-43….

*Id.* at 151-52.

The Commonwealth argues that these admissions were critical to the prosecution in order to prove Appellant's commission of an aggravated indecent assault, where the Commonwealth was required to prove that he

engaged in "penetration, however slight, of the genitals or anus of a complainant with a part of the person's body for any purpose other than good faith medical, hygienic or law enforcement procedures" and

(1) the person does so without the complainant's consent; …

(4) the complainant is unconscious or the person knows that the complainant is unaware that the penetration is occurring;

(5) the person has substantially impaired the complainant's power to appraise or control his or her conduct by administering or employing, without the knowledge of the complainant, drugs, intoxicants or other means for the purpose of preventing resistance….

18 Pa.C.S. § 3125(a).

The Commonwealth correctly notes, and Appellant does not dispute, that the minimum *mens rea* for these offenses is recklessness. "A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct." 18 Pa.C.S. § 302(b)(3). That risk "must be of such a nature and degree that, considering the nature and intent of the actor's conduct **and the circumstances known to him**, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation." *Id.* (emphasis added).

The Commonwealth argues that Appellant's

admissions that he gave other women central nervous system depressants (Quaaludes), knowing their effects, helped prove that he knew that the supposed Benadryl he gave to [Victim] would render her unconscious, or nearly unconscious, and[,] thus[,

make her] unable to consent to sex with him—at the very least, he disregarded this risk.  Indeed, [Appellant]'s admission to knowing the effect of a central nervous system depressant was critically relevant to the case because it demonstrated his familiarity with a certain prescription drug that falls within the same class of drugs as that which he alleges to have given [Appellant] on the night of the assault.

Commonwealth's Brief at 154-55.[18]   The Commonwealth maintains that

Appellant's

> familiarity with one drug and its effects in an overall class of drugs is highly probative where he claimed, in this prosecution, to have used a different drug in the same class with effects he knows to be similar.  That is, his own words about his use and knowledge of a central nervous system depressant drug, when coupled with the admissions he made claiming to have provided [Victim] Benadryl, and the expert testimony indicating that the effects experienced by [Victim] are consistent with being given a central nervous system depressant, were relevant to demonstrate [Appellant]'s intent and motive in giving [Victim] a central nervous system depressant; to wit, to render her unconscious so that he could facilitate a sexual assault.

*Id.* at 156-57.

Second, the Commonwealth contends that Appellant's admissions regarding his distribution of Quaaludes were relevant to strengthen evidence provided by the five PBA witnesses, discussed *supra*.  The Commonwealth

---

[18] The Commonwealth's expert forensic toxicologist, Dr. Timothy Rohrig, testified that both Benadryl and Quaaludes fall in the same class of central nervous system depressants.  *See* N.T., 4/18/18, at 60, 85.  Dr. Rohrig also indicated his knowledge of several cases where Benadryl (or its active ingredient, diphenhydramine) had been used to facilitate sexual assaults.  *Id.* at 74-76.   He testified that numerous other central nervous system depressants are manufactured as small, blue pills.  *Id.* at 81-82.  In any event, the Commonwealth notes that it never conceded that Appellant had given Victim Benadryl rather than another central nervous system depressant. Commonwealth's Brief at 154 n.34.

argues that, in combination, such evidence was necessary to establish Appellant's "motive and intent in administering these intoxicants. The ability of the Commonwealth to establish [Appellant]'s motive and intent through the absence of mistake was particularly critical here, where consent was a defense." *Id.* at 160.

We agree with the Commonwealth, and we are not convinced that Appellant's attempts to draw a hard distinction between Quaaludes and Benadryl present a meaningful argument for our consideration. First, the jury was free to disbelieve Appellant's assertion that he only provided Victim with Benadryl. Second, even accepting that Appellant gave Benadryl to Victim, his testimony regarding his knowledge of the effects of other central nervous system depressants, such as Quaaludes, was highly probative of "the circumstances known to him" for purposes of determining whether he acted with the requisite *mens rea* for the offense of aggravated indecent assault—recklessness. 18 Pa.C.S. § 302(b)(3). This was particularly relevant where Appellant's own admissions to his sexual contact with Victim left him contesting only her consent. His knowledge of the use of central nervous system depressants, coupled with his likely past use of the same with the PBA witnesses, were essential to resolving the otherwise he-said-she-said nature of Victim's allegations. Thus, this evidence was highly probative of Appellant's *mens rea*.

Furthermore, we do not ascertain any abuse of discretion in the trial court's determination that the probative value of this evidence outweighed its

"potential for unfair prejudice." Pa.R.E. 404(b)(2). In a vacuum, Appellant's use and distribution of a then-legal 'party drug' nearly half a century ago, does not appear highly prejudicial, at least not to the extent that there was a serious risk that it would overwhelm the good sense of a rational juror. It only becomes significantly prejudicial, *and fairly so*, when, in the context of other evidence, it establishes Appellant's knowledge of and familiarity with central nervous system depressants for purposes of demonstrating that he was at least reckless in providing a central nervous system depressant to Victim before engaging in sexual acts with her, as he should have been aware that it would substantially impair her ability to consent.

Moreover, whatever potential for unfair prejudice existed was substantially mitigated by the trial court's issuance of cautionary instructions regarding the admission of this evidence. It is undisputed that the jury was instructed to consider the evidence in question only for its admitted purpose. *See Tyson*, 119 A.3d at 362 (holding that "to alleviate the potential for unfair prejudice, the court can issue a cautionary instruction to the jury, to advise the jury of the limited purpose of the evidence and to clarify that the jury cannot treat the prior crime as proof of [Tyson's] bad character or criminal tendencies"). Moreover, "[j]urors are presumed to follow the trial court's instructions." *Id.* Accordingly, we ascertain no abuse of discretion in the trial court's admission of Appellant's civil deposition statements regarding his use and distribution of Quaaludes in the 1970s.

### F. Consciousness-of-Guilt Jury Charge

Appellant claims that the trial court abused its discretion when it issued a consciousness-of-guilt jury charge. The Commonwealth argues that this claim is waived, and the trial court agrees. *See* Commonwealth's Brief at 170-71; TCO at 116-18. We agree that Appellant waived this claim by failing to adequately preserve it below.

The Commonwealth contends that, "[a]lthough [Appellant] argued prior to the jury charge that the trial court should not issue a consciousness of guilt instruction, he made no objection to the actual instructions after they were given…." Commonwealth's Brief at 170. Indeed, regardless of any prior discussions, when the court concluded giving the instructions to the jury, neither the Commonwealth nor Appellant offered any objections. N.T., 4/25/18, at 61. At 11:08 a.m., the jury retired to deliberate. *Id.* at 66. The following day, Appellant filed written objections to the court's jury instructions. *See* Defendant William H. Cosby, Jr.'s Objections to Jury Instructions, 4/26/18, at 2 ¶ 5. Appellant contends that he adequately preserved his objection by 1) opposing the instruction during the charging conference; and 2) filing the written objections the day after the jury retired to deliberate. We disagree that those actions were sufficient to preserve his claim.

"Issues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). Furthermore, a "general exception to the charge to the jury will not preserve an issue for appeal. Specific exception shall be taken to the language or omission complained of." Pa.R.A.P. 302(b). "In order to preserve a claim that a jury instruction was

erroneously given, the [a]ppellant must have objected to the charge at trial."
*Commonwealth v. Parker*, 104 A.3d 17, 29 (Pa. Super. 2014); *see also* Pa.R.Crim.P. 647(C) ("No portions of the charge nor omissions from the charge may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate.").

In *Parker*, as here, the defendant contested a jury charge "at the charging conference." *Parker*, 104 A.3d at 29. However, he failed to object immediately after the jury was charged when prompted by the court. *Id.* We held in that case that Parker's objection at the charging conference was not sufficient to preserve a claim challenging that instruction on appeal. *Id.*; *see also Commonwealth v. Smallhoover*, 567 A.2d 1055, 1059 (Pa. Super. 1989) (deeming waived a challenge to a jury instruction under similar circumstances).

Here, under *Parker*, Appellant's objections at the charging conference were not sufficient to preserve his challenge to the consciousness-of-guilt jury charge issued by the trial court because he did not also object when the charge was given to the jury. Moreover, Appellant's attempt to preserve that challenge in the subsequently-filed written objections does not satisfy the explicit requirement in Rule 647(C) that the objection must be filed "before the jury retires to deliberate." Pa.R.Crim.P. 647(C). Thus, we agree with the trial court that Appellant waived this claim.

Nevertheless, had Appellant not waived this claim, we would deem it meritless.

[W]hen evaluating the propriety of jury instructions, this Court will look to the instructions as a whole, and not simply isolated portions, to determine if the instructions were improper. We further note that, it is an unquestionable maxim of law in this Commonwealth that a trial court has broad discretion in phrasing its instructions, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration. Only where there is an abuse of discretion or an inaccurate statement of the law is there reversible error.

**Commonwealth v. Antidormi**, 84 A.3d 736, 754 (Pa. Super. 2014) (quoting

**Commonwealth v. Trippett**, 932 A.2d 188, 200 (Pa. Super. 2007)).

Here, Appellant concedes that the Commonwealth's evidence, *if believed by the jury*, demonstrated that he offered "to pay for [Victim]'s education, therapy[,] and travel" during the phone conversations he had with Victim and Victim's mother, in which they confronted Appellant with Victim's accusation that Appellant had sexually assaulted her. Appellant's Brief at 148. However, Appellant contends that those offers did not constitute evidence of his consciousness of guilt, because:

Unlike those cases in which the courts have upheld the submission of a "consciousness of guilt" instruction to the jury, [Appellant] is not accused of fleeing; of concealing himself in some way; of altering his appearance; of threatening any witness; or of intimidating any witness. The conduct which ostensibly served as the basis for the lower court's "consciousness of guilt" instruction was consistent with wholly innocent conduct that occurred between [Appellant] and [Victim] over the period of their friendship….

*Id.* at 150.

We disagree. First, Appellant cites no authority for the proposition that consciousness-of-guilt instructions are limited to the circumstances he listed. Pennsylvania courts have specifically rejected the use of certain types of

- 75 -

evidence as consciousness-of-guilt evidence, especially when the admission of such evidence conflicts with well-established constitutional protections. *See Commonwealth v. Welch*, 585 A.2d 517 (Pa. Super. 1991) (holding that a defendant's refusal to consent to a search in the absence of a warrant was not admissible under a consciousness-of-guilt theory of relevancy); *see also Commonwealth v. Chapman*, 136 A.3d 126 (Pa. 2016) (holding that a defendant's refusal to submit to a warrantless blood test for DNA purposes was inadmissible to demonstrate consciousness of guilt).  Here, the admission of evidence concerning Appellant's offers to Victim does not conflict with these or similar constitutional principles.  Indeed, Appellant fails to cite any case law that suggests the inadmissibility of this or similar evidence.

Second, the jury was under no obligation to view Appellant's offers to Victim as "wholly innocent conduct[.]"  Appellant's Brief at 150.  In the circumstances of this case, a reasonable person could interpret Appellant's actions as an attempt to entice Victim with economic incentives not to pursue a criminal prosecution.  Appellant's argument goes to the weight of the evidence, not its admissibility under a consciousness-of-guilt theory, nor to the propriety of issuing an instruction on that theory.

Third, the evidence in question does not fall outside the underlying purpose of the consciousness-of-guilt theory for the admissibility of evidence. The courts of this Commonwealth have permitted a wide variety of evidence under auspices of the consciousness-of-guilt theory.  *See Commonwealth v. Homeyer*, 94 A.2d 743, 747 (Pa. 1953) (recognizing, as consciousness of

guilt, "manifestations of mental distress" and "fear at the time of our just before or just after discovery of the crime"); ***Commonwealth v. Sanchez***, 610 A.2d 1020, 1028 (Pa. Super. 1992) (holding that evidence of "suicide ideation" and "attempt to commit suicide" are admissible "to show consciousness of guilt"); ***Commonwealth v. Pestinikas***, 617 A.2d 1339, 1348 (Pa. Super. 1992) (holding "that an attempt by a criminal defendant to obtain and apply political pressure for the purpose of obtaining a dismissal of charges is a relevant circumstance tending to show consciousness of guilt"); *id.* (recognizing that an "attempt to influence witnesses" can constitute evidence of consciousness of guilt). Appellant's argument that he did not attempt to "conceal *himself* in some way" is purely semantical. Appellant's Brief at 150 (emphasis added). The jury could reasonably infer that by offering Victim and her mother significant economic benefits immediately after being confronted with his unlawful behavior, Appellant was attempting to influence witnesses in order to shield himself from prosecution. Accordingly, even had we not deemed this issue waived, we would ascertain no abuse of discretion by the trial court in its decision to present the jury with a consciousness-of-guilt instruction.

### G. Juror Bias

Next, Appellant claims he is entitled to a new trial because the trial court deprived him of a fair and impartial jury when it failed to remove an ostensibly biased juror. The trial court explained the circumstances leading to its decision not to dismiss the juror in question as follows:

Jury selection was completed on April 5, 2018[,] with the selection of twelve jurors and six alternates; although the jury was selected, the jury was not yet sworn. N.T., [4/5/18,] at 190. On April 6, 2018, the [c]ourt and counsel had a conference to address any outstanding issues in advance of the commencement of trial…. Following this conference, … [Appellant] filed "Defendant's Motion, and Incorporated Memorandum of Law In Support Thereof, to Excuse Juror for Cause and for Questioning of Jurors." In the Motion, [Appellant] alleged that during the jury selection process, Juror 11 indicated that he believed [Appellant] was guilty. In support of this Motion, [Appellant] filed declarations of Priscilla Horvath, the administrative assistant for [Appellant]'s Attorney Kathleen Bliss, the declaration of Richard Beasley, a defense private investigator, and the declaration of prospective Juror 9.

Ms. Horvath indicated that when she arrived at work on April 5, 2018, there was a message from prospective Juror 9. In the message, [prospective] Juror 9 indicated that she had been dismissed from the jury on April 4, 2018[,] and that there was a potential juror who stated that "he is guilty" in reference to [Appellant]. Ms. Horvath called the prospective juror back and obtained a description of the juror who purportedly made the statement. Private investigator Beasley also contacted the prospective juror; the juror relayed the same information to Beasley. Despite learning of this purported issue on April 5, 2018, at which time jury selection was still taking place, defense counsel did not bring this issue to the [c]ourt's attention at that time, or during the April 6, 2018 conference, but instead undertook an independent investigation.

On April 9, 2018, the [c]ourt held an in-camera hearing prior to the commencement of trial. At the hearing, prospective Juror 9 testified that she was on the second panel of jurors, summoned on April 3, 2018. The jurors who were not stricken for cause returned the next day, April 4, 2018, for individual *voir dire*. Prospective [J]uror 9 and eleven other prospective jurors waited in a small jury room for individual *voir dire*. The court noted during the in chambers proceeding that the room is a small room, approximately 10 feet by 15 feet. Prospective [J]uror 9 testified that she was sitting across the room from Juror 11. She testified that she was able to hear anything that anyone said in the room unless they were having a private conversation.

She testified that when they returned to the jury room after lunch, at some point in the afternoon, Juror 11 was standing by the

window, playing with the blinds. She testified that he stated that he was ready to just say [Appellant] was guilty so they could all get out of there. She testified that she was unsure if he was joking. She indicated that no one else in the room reacted to the statement and people continued to make small talk. She indicated that Juror 11 also made a statement about a comedy show that [Appellant] performed after the first trial. There was also some discussion in the group about a shooting at YouTube.

Prospective Juror 9 contacted defense counsel and left a message regarding this information. When questioned by the [c]ourt, she unequivocally indicated that she was told by the defense team that if she signed the declaration, she would not have to return to court. Defense counsel, Becky James, Esq., stated that she spoke to prospective Juror 9 over the phone and told her twice that she could not guarantee that she would not have to come back. Defense investigator Scott Ross, who actually obtained the signed declaration of prospective Juror 9, also indicated that he told her he could not guarantee she would not have to return to testify.

The [c]ourt questioned Juror 11 about the statement. The following exchange took place:

> The [c]ourt: Let me just ask you: At any time during the afternoon, for whatever reason, did you make the statement, I just think he's guilty, so we can all be done and get out of here, or something similar to that? . . .
>
> Juror 11: No.
>
> The [c]ourt: You never made such a statement?
>
> Juror 11: No.
>
> The [c]ourt: So if you were standing at the window there, you don't recall making a statement, for whatever reason, it could have been just to break the ice?
>
> Juror 11: I do not recall that.
>
> The [c]ourt: You don't recall it. Could you have made a statement like that?
>
> Juror 11: I don't think I would have.
>
> The [c]ourt: You don't think you would have?
>
> Juror 11: No.

The [c]ourt: I just want to make perfectly clear, it is okay if you did. We just-I need to track down a lot of different things and, you know, I will ask you some other questions afterwards, but it is important that if you made such a statement you do tell us.

Juror 11: (Nods).

The [c]ourt: And I'm going to let you reflect on it because it's part of the process and we do have to check these things out.

Juror 11: Okay.

The [c]ourt: So did you make that statement? If you did, it's perfectly okay.

Juror 11: No.

The [c]ourt: You did not?

Juror 11: No.

[…]

The [c]ourt: So did you hear anyone at any time mention an[] opinion when you [were] back in this room regarding the guilt or innocence of [Appellant]?

Juror 11: No.

The [c]ourt: That means whether it was joking or not joking, just any comment?

Juror 11: No, I don't remember anything like that.

The [c]ourt: So you don't remember, but you clearly know that you did not say it; is that correct?

Juror 11: Yes.

[N.T., 4/9/18, at 56-59].

Juror 11 consistently denied making any such statement, even as a joke. He also stated that he did not remark on a comedy performance of [Appellant] and indicated that people in the room discussed the shooting at YouTube.

Following Juror 11's repeated denials, the [c]ourt then interviewed the seated jurors who were in the room at the time of the alleged

statement. First, the [c]ourt interviewed seated Juror 9. [Seated J]uror 9 indicated that they did not hear anyone make a comment to the effect that [Appellant] was guilty, any comment about his guilt or innocence, or any discussion of YouTube. The [c]ourt interviewed seated Juror 10. Juror 10, likewise, did not hear anyone make a comment regarding [Appellant]'s guilt or innocence. Juror 10 indicated that they heard people discussing the shooting at YouTube. Juror 10 did not hear anyone talk about a comedy performance [by Appellant]. The [c]ourt interviewed seated Juror 12 who did not hear anyone say that they thought [Appellant] was guilty. Juror 12 did hear people discuss the shooting at YouTube. He did not hear any discussion of a comedy performance [by Appellant] that may have been on YouTube. Juror 12 was seated next to Juror 11 at the time of the alleged statement.

Following the interviews of Jurors 9, 10 and 12, the [c]ourt again questioned Juror 11. At this point, the [c]ourt told Juror 11 that a prospective juror claimed that he made a statement to the effect of "I think he's guilty, so we can all be done and get out of here." Again the juror denied making the statement.

Based on this [c]ourt's observations of the demeanor of all of the people questioned regarding the statement and its review of the declarations attached to the Motion, the [c]ourt denied the motion on credibility grounds.

TCO at 83-88 (some citations and footnotes omitted).

Appellant contends that the trial court erred in two respects. First, Appellant claims that the trial court "palpably abused its discretion in refusing to provide [Appellant] with a complete evidentiary hearing into [Juror 11]'s expressed bias." Appellant's Brief at 160-61. In this regard, Appellant believes the trial court erred by failing to call other prospective jurors to testify regarding Juror 11's alleged comment. Second, Appellant argues that the trial court "committed a palpable abuse of discretion in refusing to strike [Juror 11] based on the evidence that was adduced at [the] hearing." *Id.* at 162. Thus,

Appellant essentially argues that Juror 11 should have been removed for cause based on the record that was developed below and, alternatively, that even if he was not entitled to relief based upon the record as it stands, the trial court should have heard additional testimony.

> A trial court's decision regarding whether to disqualify a juror for cause is within its sound discretion and will not be reversed in the absence of a palpable abuse of discretion. **Commonwealth v. Stevens**, [] 739 A.2d 507, 521 ([Pa.] 1999). In determining if a motion to strike a prospective juror for cause was properly denied our Court is guided by the following precepts:
>
>> The test for determining whether a prospective juror should be disqualified is whether he is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence, and this is to be determined on the basis of answers to questions and demeanor.... It must be determined whether any biases or prejudices can be put aside on proper instruction of the court.... A challenge for cause should be granted when the prospective juror has such a close relationship, familial, financial, or situational, with the parties, counsel, victims, or witnesses that the court will presume a likelihood of prejudice or demonstrates a likelihood of prejudice by his or her conduct or answers to questions.

**Commonwealth v. Briggs**, 12 A.3d 291, 332-33 (Pa. 2011) (quoting **Commonwealth v. Cox**, 983 A.2d 666, 682 (Pa. 2009)). Additionally,

> [t]he refusal of a new trial on grounds of alleged misconduct of a juror is largely within the discretion of the trial judge. When the facts surrounding the possible misconduct are in dispute, the trial judge should examine the various witnesses on the question, and his findings of fact will be sustained unless there is an abuse of discretion.

**Commonwealth v. Posavek**, 420 A.2d 532, 537 (Pa. Super. 1980) (citation omitted).

Here, the trial court rejected Appellant's biased-juror claims, stating:

> Based on this [c]ourt's observations of the demeanor of all of the people questioned regarding the statement and its review of the declarations attached to the Motion [to remove the juror], the [c]ourt denied the motion on credibility grounds. Juror 11 answered the questions without hesitation. This [c]ourt did not find [p]rospective Juror 9 to be credible. Prospective Juror 9 claimed that she heard people talking about a comedy performance by [Appellant]; no other interviewed juror heard any such conversation. Additionally, prospective Juror 9 had a history with the District Attorney's Office. She had previously been required to complete community service and at the time of this allegation had been interviewed in connection with an ongoing fraud investigation. Based on the foregoing, this court did not abuse its discretion in refusing to strike Juror 11.

TCO at 88 (citations omitted).

We ascertain no abuse of discretion in the trial court's decision not to remove Juror 11 from the jury based on the record before us. The trial court, as factfinder, determined that prospective Juror 9's accusation was not credible, and that Juror 11's testimony, which directly contradicted prospective Juror 9's testimony, was credible. Indeed, the court's credibility determination was buttressed by the testimony of three other seated jurors who were in the immediate vicinity of prospective Juror 9 and Juror 11 at the time the purported statement was made. We are bound by the trial court's credibility determination that Juror 11 did not make any statement prejudging Appellant's culpability.

We are unpersuaded by Appellant's reliance on **State v. Ess**, 453 S.W.3d 196 (Mo. 2015). **Ess** is not a controlling authority in this jurisdiction. In any event, that case did not involve similar circumstances to the instant

matter. In *Ess*, a juror had purportedly evinced prejudgment of a case during a break in *voir dire* by stating to another juror that it was a "cut-and-dry []case." *Id.* at 200. Ess filed a motion for a new trial based on juror misconduct, and the prosecutor objected. The trial court ultimately "sustained the prosecutor's objections, which were to a lack of foundation, speculation, and hearsay." *Id.* The Supreme Court of Missouri reversed, because, *inter alia*, the trial court had failed to make any credibility assessment regarding the juror's purported statement. *Id.* at 203. Instead, the trial court had determined that, even if the statement had been made, it was not alone sufficient to demonstrate bias against the defendant rather than the prosecution. *Id.* The instant case is clearly disanalogous to *Ess*. Here, the trial court conducted a hearing, assessed the credibility of multiple witnesses, and ultimately determined that Juror 11 did not make the at-issue statement.

We also disagree with Appellant's claim that he was entitled to a more extensive hearing that would have included additional witnesses. Appellant cites no authorities to support his argument. As is evident from the record, the trial court conducted a hearing, at which no less than five witnesses testified—all of whom were in the small room at the time when Juror 11 supposedly made his biased statement. Appellant fails to produce a cogent argument that more was required. Neither case cited by Appellant suggests otherwise.

For instance, Appellant suggests a more extensive hearing was required under *Commonwealth v. Horton*, 401 A.2d 320 (Pa. 1979). We disagree.

In **Horton**, "[i]n the presence of the judge and jury panel from which his jury was later selected, [Horton] was asked by the court clerk how he pleaded to the charges against him." **Id.** at 322. Horton (mistakenly) answered, "GUILTY." **Id.** During the subsequent *voir dire*, a juror indicated that Horton's initial response of "GUILTY" had "preconditioned" his mind against Horton. **Id.** When defense counsel sought to disqualify the entire jury panel, the court refused his request.

> Defense counsel then asked to be allowed to pose an appropriate question to the jurors to determine whether or not any other jurors had heard [Horton] respond "guilty" when asked how he would plead, and, if so, whether they had been predisposed by that statement to believe [Horton was] guilty. This request was also denied by the trial judge.

**Id.** at 323. Our Supreme Court held in **Horton** that the trial court had "erred when it refused to examine the jurors regarding this incident." **Id.**

However, here, unlike what occurred in **Horton**, where the whole jury was potentially influenced by a statement by the defendant (the content of which was not disputed), the only accusation of potential bias pertained to the alleged comment made by a single juror. In **Horton**, the trial court refused to hold a hearing to question the jurors. Here, the trial court held a hearing and questioned more than five witnesses. The court questioned four seated jurors and prospective Juror 9, who had made the accusation, and concluded that prospective Juror 9's accusation was simply not credible. In **Horton**, by contrast, the content of Horton's statement was not in dispute, and it was also undisputed that he made the problematic statement in front of the jury; the

only issue that remained was how many of the jurors had heard him make the statement. Thus, we conclude that **Horton** provides no support for Appellant's assertion that he was entitled to a more extensive hearing on Juror 11's alleged statement. Accordingly, for the aforementioned reasons, Appellant is not entitled to a new trial based on his allegation of Juror 11's bias.

## H. Constitutionality of Applying SORNA II to Appellant's 2004 Offense

Finally, Appellant, challenges the constitutionality of his SVP designation, as well as his registration and reporting requirements under SORNA II. Appellant contends that the SVP provisions of SORNA II impose punitive sanctions that cannot be retroactively applied to his 2004 crime without violating the *ex post facto* clauses of the Pennsylvania and Federal Constitutions. He also argues that his SVP designation was imposed under a constitutionally insufficient standard of proof.

As background,

[c]ourts have also referred to SORNA as the Adam Walsh Act. SORNA [I was] the General Assembly's fourth enactment of the law commonly referred to as Megan's Law. Megan's Law I, the Act of October 24, 1995, P.L. 1079 (Spec. Sess. No. 1), was enacted on October 24, 1995, and became effective 180 days thereafter. Megan's Law II was enacted on May 10, 2000[,] in response to Megan's Law I being ruled unconstitutional by our Supreme Court in **Commonwealth v. Williams**, … 733 A.2d 593 ([Pa.] 1999). Our Supreme Court held that some portions of Megan's Law II were unconstitutional in **Commonwealth v. Gomer Williams**, … 832 A.2d 962 ([Pa.] 2003), and the General Assembly responded by enacting Megan's Law III on November

24, 2004. The United States Congress expanded the public notification requirements of state sexual offender registries in the Adam Walsh Child Protection and Safety Act of 2006, 42 U.S.C. §§ 16901-16945, and the Pennsylvania General Assembly responded by passing SORNA [I] on December 20, 2011[,] with the stated purpose of "bring[ing] the Commonwealth into substantial compliance with the Adam Walsh Child Protection and Safety Act of 2006." 42 Pa. C.S. § 9799.10(1). SORNA [I] went into effect a year later on December 20, 2012. Megan's Law III was also struck down by our Supreme Court for violating the single subject rule of Article III, Section 3 of the Pennsylvania Constitution. [**Commonwealth**] **v. Neiman**, … 84 A.3d 603, 616 ([Pa.] 2013). However, by the time it was struck down, Megan's Law III had been replaced by SORNA [I].

**M.S. v. Pennsylvania State Police**, 212 A.3d 1142, 1143 n.1 (Pa. Cmwlth. 2019) (quoting **Dougherty v. Pennsylvania State Police**, 138 A.3d 152, 155 n.8 (Pa. Cmwlth. 2016) (*en banc*)).

SORNA I also failed to withstand constitutional scrutiny. In **Commonwealth v. Muniz**, 164 A.3d 1189 (Pa. 2017), *cert. denied*, **Pennsylvania v. Muniz**, 138 S.Ct. 925 (2018), our Supreme Court held that

1) SORNA's registration provisions constitute punishment notwithstanding the General Assembly's identification of the provisions as nonpunitive; 2) retroactive application of SORNA's registration provisions violates the federal *ex post facto* clause; and 3) retroactive application of SORNA's registration provisions also violates the *ex post facto* clause of the Pennsylvania Constitution.

**Id.** at 1193. The **Muniz** Court deemed SORNA I's registration provisions to be punitive by applying the seven-factor test established in **Kennedy v. Mendoza–Martinez**, 372 U.S. 144 (1963). Applying **Muniz**, in conjunction with **Alleyne v. United States**, 570 U.S. 99 (2013), this Court deemed unconstitutional the SVP assessment provision of SORNA I, 42 Pa.C.S. §

9799.24, because "it increases the criminal penalty to which a defendant is exposed without the chosen fact-finder making the necessary factual findings beyond a reasonable doubt." ***Commonwealth v. Butler***, 173 A.3d 1212, 1218 (Pa. Super. 2017), *reargument denied* (Jan. 3, 2018), *appeal granted*, 190 A.3d 581 (Pa. 2018).

In direct response to ***Muniz*** and ***Butler***, our General Assembly passed SORNA II, which became effective on June 12, 2018. ***See*** 42 Pa.C.S. § 9799.51(d)(4) (indicating the "intention of the General Assembly" to "[a]ddress the Pennsylvania Supreme Court's decision in … ***Muniz***…, and the Pennsylvania Superior Court's decision in … ***Butler***…."). This Court has already addressed a constitutional challenge to SORNA II. In ***Commonwealth v. Moore***, ---A.3d----, 2019 PA Super 320 (Pa. Super. filed Oct. 23, 2019), a panel of this Court held that the internet registration provisions of SORNA II violate the federal *ex post facto* clause. ***Id.*** at *9. However, the ***Moore*** Court also determined that "the Internet provisions of SORNA II are severable from the rest of the statutory scheme." ***Id.*** Additionally, the constitutionality of SORNA II as a whole is currently before our Supreme Court. ***See Commonwealth v. Lacombe***, 35 MAP 2018 (Pa. 2018).

Instantly, Appellant claims "SORNA II still violates … ***Alleyne***. A sexually violent predator determination still punishes a defendant with automatic lifetime registration and counseling." Appellant's Brief at 172. He continues:

> Specifically, with the Aggravated Assault conviction for which [Appellant] has been convicted, the registration period was extended from ten years to lifetime; thereby drastically increasing his punishment without the benefit of trial, and without a jury finding beyond a reasonable doubt.

*Id.* Appellant then goes on to present a challenge to SORNA II in its entirety. *See id.* at 173-75.

> The Commonwealth contends that:

> As an initial matter, if [Appellant] now attempts to challenge the imposition of his non-SVP registration requirements under [SORNA II], that claim is waived, as he did not raise it in his 1925(b) statement. *See* … *Lord*, 719 A.2d [at] 309 … (any issues not raised in a 1925(b) statement are waived on appeal). In that statement, [Appellant] stated only that "[t]he trial court abused its discretion, erred, and infringed on [Appellant's] constitutional rights in applying the [SVP] provisions of [SORNA II] for a 2004 offense in violation of the [*e*]*x* [*p*]*ost* [*f*]*acto* [*c*]lauses of the State and Federal Constitutions." [Appellant's 1925(b) Statement] at ¶ 11. Accordingly, he has only preserved a challenge to the SVP provisions of Subchapter I.

Commonwealth's Brief at 198.

We agree with the Commonwealth. Appellant only challenged the trial court's application of the SVP provisions of SORNA II on *ex post facto* grounds in his Rule 1925(b) statement. As such, he has waived any challenge to the general provisions of SORNA II that are unrelated to his designation as an SVP. *Lord, supra*. He has also waived his claim that his SVP status was imposed below the beyond-a-reasonable-doubt standard of proof. Thus, the only issue raised in Appellant's Rule 1925(b) statement that was preserved for appellate review is whether the trial court's application to Appellant of the

SVP provisions of SORNA II violates the *ex post facto* clauses of the Pennsylvania and Federal Constitutions.

Before we address the merits of Appellant's constitutional claim, however, the Commonwealth presents a second waiver argument based on Appellant's ostensible failure to adequately develop the SVP claim in his brief. The failure to provide a relevant analysis that discusses pertinent facts may result in waiver under Pa.R.A.P. 2119. ***See Commonwealth v. Rhodes***, 54 A.3d 908, 915 (Pa. Super. 2012); ***see also*** Pa.R.A.P. 2119(a) ("The argument shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part--in distinctive type or in type distinctively displayed--the particular point treated therein, ***followed by such discussion and citation of authorities as are deemed pertinent***.") (emphasis added).

As noted by the Commonwealth:

> [Appellant] has presented no pertinent discussion here. His claim rests on the premise that Subchapter I [of SORNA II] constitutes criminal punishment. Although he notes the existence of the seven-factor ***Mendoza-Martinez*** test for determining whether a statute is punitive, [Appellant]'s Brief … at 173-[]74, he never ***applies*** the test to the statute. Instead, he identifies three random provisions of Subchapter I and asserts that "[SORNA II] is still punitive." ***Id.*** His failure to provide any meaningful analysis of how the statute is supposedly punitive in light of the ***Mendoza-Martinez*** factors renders his claim waived.

Commonwealth's Brief at 199 (footnote omitted; emphasis in original).

We agree. The portion of Appellant's argument that specifically addresses the constitutionality of his registration and reporting requirements as an SVP is poorly developed. Appellant cites—but fails to adequately apply—

- 90 -

the ***Mendoza-Martinez*** test to the provisions of SORNA II triggered by his SVP status.   While he identifies several aspects of SORNA II that have remained virtually unchanged since SORNA I, he fails to provide any discussion, whatsoever, concerning the alterations made by the General Assembly in crafting SORNA II in response to ***Muniz*** and ***Butler***.   This omission is fatal under Rule 2119, as the discussion of such changes is critical to any pertinent analysis of whether SORNA II's SVP provisions are punitive and, thus, subject to state and federal prohibitions of *ex post facto* laws.

Most importantly, Appellant fails to discuss the impact of the addition of 42 Pa.C.S. § 9799.59(a) in SORNA II.   Unlike in SORNA I, or in any prior version of Megan's Law for that matter, Section 9799.59(a) provides a mechanism by which sex offender registrants, including SVPs, can be relieved of part or all of their registration, reporting, and counseling requirements under SORNA II.  Specifically, an SVP may petition the sentencing court for complete relief from their obligations under SORNA II after 25 years, or after "the petitioner's release from custody following the petitioner's most recent conviction for an offense, whichever is later."  42 Pa.C.S. § 9799.59(a)(1). Upon receiving such a petition, the sentencing court must direct the Sexual Offender Assessment Board to assess whether, if the petitioner is granted relief, he or she "is likely to pose a threat to the safety of any other persons." 42 Pa.C.S. § 9799.59(a)(2).  The Sexual Offender Assessment Board must respond to the sentencing court with its report within 90 days.  42 Pa.C.S. §

9799.59(a)(3). The petitioner is then entitled to a hearing within 120 days of the petition, where the

> petitioner and the district attorney shall be given notice of the hearing and an opportunity to be heard, the right to call witnesses and the right to cross-examine witnesses. The petitioner shall have the right to counsel and to have a lawyer appointed to represent the petitioner if the petitioner cannot afford one.

42 Pa.C.S. § 9799.59(a)(4). The petitioner may then be exempted

> from application of any or all of the requirements of this subchapter, at the discretion of the court, only upon a finding of clear and convincing evidence that exempting the petitioner from a particular requirement or all of the requirements of this subchapter is not likely to pose a threat to the safety of any other person.

42 Pa.C.S. § 9799.59(a)(5). Both the Commonwealth and the petitioner are entitled to appellate review from that decision. 42 Pa.C.S. § 9799.59(a)(7). Moreover, if denied relief, the "petitioner may file an additional petition with the sentencing court no sooner than five years from the date of the final determination of a court regarding the petition and every five years thereafter." 42 Pa.C.S. § 9799.59(a)(8).

In his brief, Appellant provides no accounting for Section 9799.59 in his constitutional challenge to the SVP-triggered provisions of SORNA II. Appellant does not discuss how that provision impacts the **Mendoza-Martinez** test for determining whether SORNA II is punitive. Thus, Appellant does not provide a pertinent discussion of whether this Court's concerns in **Butler** have been adequately alleviated by the General Assembly's crafting of

SORNA II. Accordingly, we agree with the Commonwealth that Appellant has waived this claim by failing to provide a meaningful analysis for our review.

In any event, for the same reason, had we reached the merits of his claim, it would fail.

> When an appellant challenges the constitutionality of a statute, the appellant presents this Court with a question of law. ***See Commonwealth v. Atwell***, 785 A.2d 123, 125 (Pa. Super. 2001) (citation omitted). Our consideration of questions of law is plenary. ***See id.*** … (citation omitted). A statute is presumed to be constitutional and will not be declared unconstitutional unless it clearly, palpably, and plainly violates the constitution. ***See Commonwealth v. Etheredge***, 794 A.2d 391, 396 (Pa. Super. 2002) (citations omitted). Thus, the party challenging the constitutionality of a statute has a heavy burden of persuasion. ***See id.*** … (citation omitted).

***Commonwealth v. Howe***, 842 A.2d 436, 441 (Pa. Super. 2004).

Here, Appellant's failure to address the changes between SORNA I and SORNA II, and in particular, whether the SVP provisions of SORNA II remain punitive despite the addition of Section 9799.59, demonstrates that he cannot overcome the heavy burden of persuasion to demonstrate that the SVP-triggered provisions of SORNA II clearly, palpably, and plainly violate the state and federal *ex post facto* clauses. Accordingly, had we reached the merits of his claim, Appellant would still not be entitled to relief.

Judgment of sentence ***affirmed***.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>12/10/19</u>